**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Fidelity National Financial, Inc., a Delaware corporation, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. CIV 03-1222 PHX RCB |
| vs. | ) ) | O R D E R |
| | ) | |
| Colin H. Friedman, individually and as trustee of the Friedman Family Trust UDT, dated July 23, 1987; Hedy Kramer Friedman, individually and as trustee of the Friedman Family Trust UDT, dated July 23, 1987; Farid Meshkatai, an individual; and Anita Kramer Meshkatai, individually and as trustee of the Anita Kramer Living Trust, dated July 23, 1987, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

### *Introduction*

In <u>Fidelity Nat. Financial, Inc. v. Friedman</u>, 2009 WL 890471,

(D.Ariz. March 31, 2009) ("<u>Fidelity I</u>"), this court, *inter alia*,

granted a motion by plaintiffs, Fidelity National Financial, Inc. and Fidelity Express Network, Inc. ("Fidelity"), for an Order to Show Cause ("OSC") as to why defendants Farid and Anita Meshkatai, and the Kramer Insurance Trust ("the Trust") and non-parties, Daniel Campbell, and Allen Hyman,[1] should not be held in civil contempt for alleged violations of an October, 2006 subpoena to non-party, Yariv Elazar, and subsequent order to compel, <u>Fidelity Nat. Financial, Inc. v. Friedman</u>, 2007 WL 446134 (D.Ariz. Feb. 7, 2007).[2]   Fidelity's theory is that this alleged contempt is part of a larger scheme by the Meshkatai defendants and others to fraudulently transfer assets to avoid Fidelity's attempts to collect on its nearly $8.5 million judgment against all of the defendants herein.

Because "it would be impermissible to resolve the issue of civil contempt based solely upon the competing affidavits, declarations and other filed documents[,]" <u>Fidelity I</u>, 2009 WL 890471, at *8, the court held an evidentiary hearing. After carefully considering the evidence, including the testimony of eight witnesses, and the respondents' respective arguments, the court rules as follows.

. . .

---

[1]     For ease of reference, unless necessary to distinguish among them, the above-named individuals and the Trust collectively will be referred to throughout as "the respondents."

[2]     The court assumes familiarity with <u>Fidelity I</u> and that order to compel, and incorporates by reference the relevant portions of those earlier decisions.

## *I.  Personal Jurisdiction*

There is a threshold issue as to personal jurisdiction.  Two non-parties, "The Anna and Noach Kramer Irrevocable Insurance Trust ("the Trust")" and attorney Allen Hyman, are contesting personal jurisdiction.  It is critical to resolve that issue at the outset because "[p]ersonal jurisdiction. . . is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication."  Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583, 119 S.Ct. 1563, 1570, 143 L.Ed.2d 760 (1999) (citation and internal quotation marks omitted); see also Wells v. Kearney, 2009 WL 2568635, at *9 (D.Ariz. Aug. 18, 2009) (citation and internal quotation marks omitted) ("Because a court without jurisdiction over the parties cannot render a valid judgment, [the court] must address Defendants' personal jurisdiction argument before reaching the merits of the case.")  This is equally true in the contempt context.  See  Hilao v. Estate of Marcos 94 F.3d 539, 545 (9th Cir. 1996) ("Estate III") (citation

---

[3]  There are two preliminary issues which need not detain the court for long.  The first is a Request for Judicial Notice ("RJN") by Mr. Hyman (doc. 268), which is unopposed.  That RJN, pertaining to 20 separate documents, includes court orders; docket reports, or portions thereof, filed in this and other related actions; a Local Rule of this court; and several notices of motion filed in other related actions.  Plainly those documents are all matters of public record.  Therefore, pursuant to Fed. R. Evid. 201 the court grants in its entirety Mr. Hyman's RJN,  and will consider those exhibits to the extent necessary to resolve this OSC.  See, e.g., Rein's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice, as a matter of public record, "pleadings, memoranda, expert reports, etc., from [earlier] litigation[,]" which were thus "readily verifiable").

Second, during the hearing the court took under advisement the admission of two exhibits.  The first is a February 8, 2007, e-mail from Ms. Hemann, an associate in attorney Campbell's office (def. exh. 54).  The second is a declaration in a related matter from the Trust's former Trustee, Steven Spector (def. exh. 37).  The objections to both exhibits are not well founded.  See Hearing Transcript (doc. 288) ("Tr. I") at 147-49; and 156-58.  Thus, the court will receive these exhibits.  As will be seen, however, neither exhibit is necessary to resolving the contempt issues herein.

and internal quotation marks omitted) ("It is essential to the power to punish for contempt that the court . . . have jurisdiction of the person.")

"As [t]he personal jurisdiction requirement recognizes and protects an individual liberty interest, . . . , it can, like other such rights, be waived." Dow Chemical Co. v. Calderon, 422 F.3d 827, 831 (9th Cir. 2005) (citations and internal quotation marks omitted). "[B]ecause the personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court." Id. (citations and internal quotation marks omitted). In the present case, as to the Trust, Fidelity argues that it waived its right to contest personal jurisdiction due to the untimely filing of the Trust's response to Fidelity's OSC motion. Fidelity further asserts that because it petitioned for relief in the Superior Court of Arizona, Maricopa County, the Trust consented to personal jurisdiction in this court. Both arguments are unavailing.

### A. Waiver

Initially, in opposing Fidelity's motion for an OSC, the Trust explicitly raised the issue of lack of personal jurisdiction. "[F]ind[ing] the Trust's personal jurisdiction arguments 'premature' because [the court] deem[ed] the process to be the OSC, which . . . ha[d] not yet issued[,]" the court left "for another day the Trust's" lack of personal jurisdiction argument. Fidelity I, 2009 WL 890471, at *6.

Although from the outset the Trust expressly asserted lack of personal jurisdiction, Fidelity insisted that the Trust waived the

- 4 -

right to contest personal jurisdiction because of the Trust's untimely response to the OSC motion. See Reply (doc. 222) at 2, § II(A). This court denied Fidelity's motion to strike the Trust's objection as untimely though. See Fidelity I, 2009 WL 890471, at *6. A logical corollary of that holding is that the court will not find a waiver of personal jurisdiction on the basis of untimeliness.

Attorney Bass has been representing the Meshkatais in this action since August, 2008. See Docs. 208 and 209. From that time until the OSC hearing, every filing by Mr. Bass and every appearance by him was solely on behalf of the Meshkatais. See e.g., Docs. 216; 217; and 229. Likewise at the status conference setting a date for the OSC hearing, Mr. Bass appeared on behalf of the Meshkatais and Anita Meshkatai, as Trustee of the Anita Kramer Living Trust, dated July 23, 1987 - also a party to this action. Doc. 258 at 2:14-15; and at 8:13-21. At that conference, however, no attorney appeared on behalf of the respondent Trust. Id. at 10:6-10.

Despite the foregoing, for the first time, at the OSC hearing attorney Bass indicated that he was representing the Trust. More specifically, Mr. Bass identified himself as "counsel for the Meshkatais and the party identified as the Trust in Your Honor's order." Tr. I (doc. 288) at 5:10-12. Presumably, attorney Bass was referring to The Anna and Noach Kramer Irrevocable Insurance Trust, as explained in Fidelity I, 2009 WL 890471, at *1 n. 2.

The court declines to find that the Trust waived its right to contest personal jurisdiction based upon that purported appearance, however. In contravention of LRCiv 83.3, Mr. Bass never filed a

notice of appearance, a formal substitution or association of
counsel indicating that he was appearing as counsel of record on
behalf of the Trust.  See LRCiv 83.3 ("[N]o attorney shall appear
in any action or file anything in any action without first
appearing as counsel of record.  In any matter, . . . there must be
a formal substitution or association of counsel before any
attorney, who is not an attorney of record, may appear.") Indeed,
the only filings on behalf of the Trust were by attorney O'Rourke,
with the Phoenix, Arizona office of Lewis, Brisbois, Bisgaard &
Smith LLP -- not by attorney Bass.  See, e.g., Doc. 204.  Given the
confused state of the record as to Mr. Bass' purported
representation of the Trust, combined with the Trust's initial
unequivocal objection to personal jurisdiction, the court declines
to find that the Trust waived its personal jurisdiction defense
based upon that supposed appearance at the OSC by attorney Bass.

The court similarly finds that attorney Hyman's appearance at
the OSC did not constitute a waiver of his right to contest
personal jurisdiction.   In fact, Fidelity never suggested such a
waiver.  Perhaps that is because Mr. Hyman raised that
jurisdictional issue in his opposition to the OSC.  See Doc. 264 at
15.  Further, Mr. Hyman "especially appear[ed] for [him]self[]" at
the OSC hearing, and noted that in Fidelity I there had not been
any finding as to personal jurisdiction over him.  Tr. I (doc. 268)
at 5:17; at 160:14-15.  Given that the "technical distinctions
between general and special appearances have [long since] been
abolished" by enactment of the Federal Rules of Civil Procedure,
Mr. Hyman did not need to specify the nature of his appearance to
preserve the personal jurisdiction argument.  See Hamilton v.

Willms, 2007 WL 2904286, at *3 (E.D.Cal. Oct. 4, 2007).

### B. Consent

Fidelity's consent argument is another of the personal jurisdiction arguments which this court left in abeyance in Fidelity I, 2009 WL 890471 at *6, and now must address. Fidelity premises its consent argument upon a 2005 Arizona state court action. In that action, then Trustee Steven Spector filed a "Petition for Instructions, and to Confirm Interpretation of Irrevocable Insurance Trust[,]" which the court granted. Reply (doc. 222), exh. 10 thereto at 86-90; and 101. Defendant Anita Meshkatai, among others, signed a declaration in support of that Petition. Id. at 97-98.

Based upon the foregoing, Fidelity maintains that by seeking relief in an Arizona state court, the Trust consented to personal jurisdiction in this federal district court action. Fidelity does not offer any legal support for its argument; perhaps that is because there is none. In fact, Ninth Circuit precedent is to the contrary.

In Dow Chemical Co. v. Calderon, 422 F.3d 827 (9th Cir. 2005), the Court held that defendants did not consent to personal jurisdiction. The Court found no consent even though defendants had not objected to personal jurisdiction in a prior federal court action involving a different plaintiff, but the same underlying judgments. Id. at 835-36. In so holding, the Ninth Circuit distinguished two decisions outside this Circuit holding that "personal jurisdiction exists where a defendant also independently seeks *affirmative* relief in a separate action before the **same court** concerning the **same transaction or occurrence**." Id. at 834 (bold

emphasis added).  The Ninth Circuit distinguished those cases on the basis that the Dow Chemical defendants had not sought affirmative relief in the first action, but instead were defendants.  Id.  Moreover, in the first action defendants made a choice to defend on the merits "only *after* they were haled into the district court" by plaintiff in the prior action.  Id. at 836.  In contrast, the Ninth Circuit reasoned, "[w]ithout an independent affirmative decision to seek relief in our courts, there can be no imputation of a conscious decision to settle all aspects of a dispute here."  Id.

In the present case, the Trust is in a slightly different position than the Dow Chemical defendants.  Nonetheless, Dow Chemical mandates the same result here: the Trust did not consent to personal jurisdiction in this federal court by proceeding with that Arizona state court action.  Admittedly, the Trust petitioned for affirmative relief in that prior state court action.  But obviously the Trust was not seeking that relief before this federal district court.  Further, the relief which the Trustee sought in the Arizona state court action – instructions as to how to construe the Trust  –  is wholly unrelated to the transaction or occurrence at issue here – a contempt proceeding stemming from Fidelity's attempt to execute on a foreign judgment.  Thus, based upon the rationale of Dow Chemical, the court finds that Trust's prior Petition to an Arizona state court does not establish that it has consented to personal jurisdiction in this subsequent federal court action.

Having rejected Fidelity's waiver and consent-based personal jurisdiction arguments, the court must address the personal

jurisdiction issue on the merits. <u>See</u> <u>Ciolli v. Iravani</u>, 625 F.Supp.2d 276, 292 (E.D.Pa. 2009) ("Because plaintiff may not rely on Defendants' waiver for the exercise of personal jurisdiction, he must establish general or specific personal jurisdiction over Defendants.") Likewise, having found that attorney Hyman did not waive personal jurisdiction by appearing at the OSC hearing, the court also must address whether it has personal jurisdiction over him.

### C. Merits

"*In personam* jurisdiction, simply stated, is the power of a court to enter judgment against a person." <u>S.E.C. v. Ross</u>, 504 F.3d 1180, 1138 (9th Cir. 2007). "The familiar 'minimum contacts' test," adopted in the seminal case of <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), "coupled with statutory authorization, provides a *basis* for an exercise of jurisdiction[.]" <u>Id.</u> (emphasis added by <u>Ross</u> Court). On the other hand, "service of process is the *mechanism* by which the court [actually] acquires the power to enforce a judgment against the defendant's person or property." <u>Id.</u> (citation and internal quotation marks omitted) (emphasis added by <u>Ross</u> Court). Thus, although often conflated, "[s]ervice of process is a distinct and separate concept from the court's personal jurisdiction[.]" <u>Rose v. Miss Pacific LLC</u>, 2009 WL 1688123, at *3 (D.Or. June 15, 2009). Accordingly, "[w]ithout a proper basis for jurisdiction, or in the absence of proper service *of process*, the district court has no power to render any judgment against the defendant's person or property unless the defendant has consented to jurisdiction or waived the lack of process." <u>Ross</u>, 504 F.3d at 1138-1139

(citations omitted) (emphasis added).

Plainly then, before issuing an order of contempt against non-parties such as the Trust and Mr. Hyman, there must be a basis for the exercise of that jurisdiction and a mechanism by which this court can assert personal jurisdiction. For the moment, the court will limit its inquiry to whether the Trust and Mr. Hyman were properly served. As to service, quoting from one prominent commentary on the Federal Rules, the Ninth Circuit has stated, "'[w]hen it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, that party must be served with process as in any other civil action.'" Estate III, 94 F.3d at 545 (quoting 11A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 2960 (1995)); accord Comverse, Inc. v. American Telecommunications, Inc. Chile S.A., 2009 WL 464446, at *2 n.4 (S.D.N.Y. Feb. 24, 2009) (citation omitted) (where it "appear[ed]" that the court lacked personal jurisdiction over non-parties because there was no evidence of proper service, the court was "[w]ithout personal jurisdiction" and could not "hold them in contempt[]").

In opposing Fidelity's motion for an OSC, the Trust specifically challenged whether this court has personal jurisdiction over it. See Trust's "Objection to Jurisdiction and Opposition" to Pl. OSC Mot. (doc. 204) at 3-6. The Trust's cursory analysis of that issue did not mention service of process at all. In the accompanying declaration of former Trustee Spector, however, he avers that "[t]he Trust was never served." Spector Decl'n (doc. 204) at 10, ¶ 7:18. Mr. Spector further questioned "[t]he

purported service on the non-existent . . . Kramer Insurance Trust[,]" which "consisted of service of Plaintiff's [OSC] Motion on [him], the Trustee of The Anna and Noach Kramer Irrevocable Insurance Trust." Id. at 10, ¶ 7:18-20. Lastly, Mr. Spector averred that "[t]o [his] knowledge there has been no service of a summons or any other means of properly bringing the Trust before this Court." Id. at 10, ¶ 7:20-22.

Fidelity counters that the Trust has no basis for disputing service because the OSC Motion was properly served upon the Trust in accordance with Ariz. R. Civ. P. 4.1(k)[4] and 4.2(h).[5] In particular, Fidelity notes that it personally served the OSC Motion upon Mr. Spector. Fidelity's Reply (doc. 222), Kroll Decl'n, exh. 1 thereto at 15. In addition, Fidelity disagrees with the Trust's contention that it must be served with a summons before this court has personal jurisdiction over the Trust.

Mr. Hyman vaguely mentions, in opposing Fidelity's OSC, that he is "rais[ing] objection[s] based upon jurisdiction and due process[,]" but he never expands upon that statement. Hyman Resp. (doc. 264) at 15:26-27 (emphasis omitted). Hyman merely states that Fidelity did not "undertake" to meet its burden "to insure

---

[4] That Rule states in relevant part that "[s]ervice upon a[n]. . . unincorporated association which is subject to suit in a common name, . . . , shall be effected by delivering a copy of the *summons* and of the pleading to a partner, an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the party on whose behalf the agent accepted or received service." Ariz. R. Civ. P. 4.1(k) (emphasis added).

[5] This Rule governs service upon, among others, "[u]nincorporated [a]ssociations [l]ocated [o]utside Arizona but [w]ithin the United States[.]" Ariz. R. Civ. P. 4.2(h). "[S]ervice under th[at] Rule shall be made on one of the persons specified in Rule 4.1(k)[,]" quoted in the preceding footnote. Ariz. R. Civ. P. 4.2(h).

that the Court's jurisdiction extended to [him][.]" <u>Id.</u> at 15:28-16:1. Hyman then immediately proceeded to argue why he should not be held in contempt.

Later in his opposition Hyman again alluded to the personal jurisdiction issue, broadly stating that "[t]here are . . . troubling issues that FIDELITY did not serve" the OSC on him "until April 23, 2009 by *email*."[6] <u>Id.</u> at 20:16-18 (italicized emphasis added); <u>see also</u> Hyman Decl'n (doc. 265) at 15, ¶ 68:6-8 (citing exh. 24 thereto). Again, Mr. Hyman did not elaborate. Despite the fact that it has the burden of proof as to personal jurisdiction, <u>Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.</u>, 784 F.2d 1392, 1397 (9th Cir. 1986), Fidelity did not respond to Mr. Hyman's lack of personal jurisdiction contentions, either at the OSC hearing or in its "Bench Brief" submitted in support of that hearing.

In any event, there is confusion here as to the manner in which service must be accomplished and the documents which must be served. Fidelity's argument that it properly served the OSC Motion upon the Trust, and thus the court has personal jurisdiction over the Trust are not germane in light of <u>Fidelity I</u>. In that decision, this court specifically found that the "process here" is the OSC itself, as opposed to Fidelity's motion or a summons. <u>Fidelity I</u>, 2009 WL 890471, at *6 (citation omitted). Thus, at this juncture it is irrelevant whether Fidelity properly served the Trust with the OSC Motion. It is likewise irrelevant that the

---

[6] As will be discussed above, the record shows that Fidelity attempted service of the OSC upon Mr. Hyman by overnight delivery, not by e-mail, as Mr. Hyman claims.

Trust was not served with a summons.  Instead, the focus is upon

whether Fidelity properly served the Trust with the OSC itself,

*i.e.* <u>Fidelity I</u>.

Because the process here is an OSC and not a summons, the

court must look to Rule 4.1(a).  That Rule governs the method for

service of "[p]rocess . . . *other than* a summons under Rule 4 or a

subpoena under Rule 45[.] Fed. R. Civ. P. 4.1(a) (emphasis added).

Rule 4.1(a) "directs who shall make service – a U.S. marshal,

deputy marshal, or special appointee[.]"  <u>Hilao v. Estate of</u>

<u>Marcos</u>, 95 F.3d 848, 853 (9th Cir. 1996).  That Rule further

specifies "where that officer can make such service – anywhere

within the state in which the district court sits[.]" <u>Id.</u>  That

Rule is silent, however, as to "the manner in which service shall

be made (e.g., personally, by mail, etc.) or upon whom service

shall be made." <u>Id.</u>  Therefore, in <u>Hilao</u>, a judgment enforcement

proceeding like the present action, the Ninth Circuit held that in

accordance with Rule 69(a)[7], "state law" provides "those latter

requirements for service[.]" <u>Id.</u>  When read together, the <u>Hilao</u>

Court found that although the judgment creditor complied with Fed.

R. Civ. P. 4.1, that did not excuse its failure to comply with

California law governing service on a financial institution in

---

[7]     Subsection (1) of that Rule provides that:

[t]he procedure on execution – and in proceedings
supplementary to and in aid of a judgment,
and in proceedings on and in aid of judgment or
execution – must accord with the procedure
of the state where the court is located, but a
federal statute governs to the extent it applies.

Fed. R. Civ. P. 69(a)(1). Fidelity invoked subsection (2) of that Rule in seeking
the order to compel which is one of the bases of this contempt proceeding.
<u>Fidelity</u>, 2007 WL 446134, at *2.

enforcement proceedings.

Here, unlike <u>Hilao</u>, state law is not implicated in any way -
as to service of the OSC or otherwise. In the first place, this is
an action to execute on a money judgment pursuant to Fed. R. Civ.
P. 69. As subsection (2) of that Rule allows,[8] Fidelity issued a
subpoena pursuant to Fed. R. Civ. P. 45(a)(2)(C) upon non-party
Elazar. Elazar's failure to comply with that subpoena, in this
court's opinion, warranted an award of sanctions pursuant to Fed.
R. Civ. P. 45(e). <u>See</u> <u>Fidelity</u>, 2007 WL 446134, at *4. Fidelity
later brought a motion for an OSC seeking an order of contempt
pursuant to Fed. R. Civ. P. 37(b)(2)(D). Fidelity also relied upon
this court's "inherent power to impose sanctions . . . for bad
faith conduct in litigation or for willful disobedience of a court
order[]" in accordance with federal case law. OSC Mot. (Doc. 191)
at 12:14-16 (internal quotation marks and citation omitted).
Despite the absence of state law here, <u>Hilao</u> is nonetheless
instructive, especially as to Fed. R. Civ. P. 4.1.

There is no dispute that neither the Trust nor Mr. Hyman were
served with the OSC by a United States marshal or deputy marshal or
by a special appointee, as Rule 4.1(a) requires. According to a
"Proof of Service" filed with this court, Fidelity purported to
serve the Trust and Mr. Hyman, among others, by sending them the
OSC via "overnight delivery[.]" Def. Exh. 53 at 2-3 (emphasis

---

[8] Rule 69(a)(2) provides in relevant part:

In aid of the judgment or execution, the judgment
creditor . . . may obtain discovery from any person
. . . as provided in these rules or by the procedure
of the state where the court is located.

Fed. R. Civ. P. 69(a)(2).

omitted). Fidelity also purported to serve the Trust and Mr. Hyman by overnight delivery the "civil minutes[,]" setting the hearing date for the OSC and the completion date for the Elazar deposition. See id. Service by overnight delivery does not satisfy Rule 4.1(a)'s requirement that service be made by "United States marshal or deputy marshal or by a person specially appointed for that purpose." Therefore, because Fidelity did not serve the OSC in compliance with Rule 4.1 upon either the Trust or Mr. Hyman, this court does not have personal jurisdiction over those two non-parties. See Liao v. Ashcroft, 2009 WL 636191, at *3 (N.D.Cal. March 11, 2009) (citation omitted) ("Service of process (in the absence of a voluntary appearance or a conscious waiver) is an indispensable prerequisite to the court's jurisdiction to proceed.")

Because neither the Trust nor Mr. Hyman were properly served, there is no need to address Fidelity's assertion that the Trust has sufficient contacts with Arizona so as not to offend traditional notions of due process. Moreover, as will be seen, even if the court could properly exercise personal jurisdiction over the Trust and Mr. Hyman, Fidelity has not been its burden of proving contempt by clear and convincing evidence as to either.

## II. Civil Contempt

### A. Background

Fidelity contends that respondents should be found in contempt for violating (1) the October, 2006 subpoena issued to non-party Elazar; and (2) this court's order to compel, also directed

solely to Mr. Elazar.[9]  Ultimately roughly 400 documents were produced in response to those orders.  Tr. I (doc. 288) at 10; <u>see also</u> Pl. Exh. 11.  Yet, Fidelity is seeking a finding of contempt based upon the failure to timely produce a single document  – the "Deed of Full Release and Reconveyance (Beneficiary)" ("the Deed Release") (Pl. Exh. 15-1).

That Release, dated January 19, 2007, is signed by defendants Farid and Anita Meshkatai as "[m]anager[s]" of Eliani, LLC.  Pl. Exh. 15-1 <u>Id.</u>  The Meshkatais also signed that Release as "[b]eneficiar[ies]" under a "Deed of Trust executed by Yariv Elazar, Trustors(s) [sic], to Transnation Title Insurance Company Trustee, for the benefit of Eliani, . . . . , Beneficiary[.]" <u>Id.</u>  Pursuant to the terms of that Release:

> Eliani, as 'the Beneficiary under [that] Deed of Trust[,] . . . release[d] and reconvey[ed], without covenant or warranty, express or implied, unto the parties legally entitled thereto all right, title and interest which was heretofore acquired by . . . Trustee [Transnation Title] under said Deed of Trust, for the benefit of the [Eliani].

<u>Id.</u>  Fidelity was not aware of this Deed Release until Mr. Elazar produced it at his May 14, 2008 deposition.  Mr. Elazar produced that Release at his May 14, 2008 deposition, in response to an April 8, 2008 subpoena *duces tecum* from Fidelity.

At his deposition, Mr. Elazar first became aware that the $1,170.00 in sanctions which this court ordered him to pay were paid by a March 12, 2007 check actually paid on a check drawn on the Eliani account, signed by Mrs. Meshkatai.  Pl. Exh. 12-1.

---

[9]     "A subpoena duces tecum is itself a court order[.]" <u>Fidelity</u>, 2007 WL 446134, at *4.  Thus, unless necessary to distinguish between the subpoena and the order to compel, hereinafter they shall be referred to collectively as "the orders."

Originally, in its OSC motion Fidelity was seeking a contempt order based upon this sanction payment, as well as upon the untimely production of the Deed Release.  During the hearing there was proof, albeit scant, regarding the sanction payment.  As Fidelity expounded upon its contempt theory, it did not mention the sanction payment at all.  See, e.g. Tr. I (doc. 288) at 6-11; and Hearing Transcript (doc. 305) ("Tr. II") at 293-303.  Evidently Fidelity has abandoned the theory that payment of the sanctions by Eliani constitutes contempt.

Narrowing the scope of relief which Fidelity is now seeking corresponds to the limitations which this court placed upon Fidelity in terms of available relief.  As this court previously held, if that sanctions check was a violation of any order, it was the California RICO court's preliminary injunction freezing Eliani's assets, among others.  See Fidelity I, 2009 WL 890471, at *3 and *4.  Accordingly, as did Fidelity, the court will confine its inquiry to whether any of the respondents, due to the belated production of the Deed Release, can be held in contempt for violating this court's orders.

### B.  Legal Standards - Generally

Fidelity argues that each of the respondents should be held in contempt for violating prior orders of this court.  In considering this argument, the court will continue to be guided by the basic contempt principles set forth in Fidelity I.[10]  The court stresses,

---

[10]     In Fidelity I, this court explained in relevant part:

In a civil contempt proceeding, [t]he moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. . . . A mere[ ] . . . preponderance of the evidence[ ] will not

however, that because respondents were not subject to those prior

court orders, there must be a showing that they "either *abet[ted]*

[Elazar] [in violating those orders] *or* [are] *legally identified*

*with* [Elazar], . . . and that the[y] ha[d] notice of the

order[s][.]" <u>Fidelity I</u>, 2009 WL 890471, at *6 (quoting <u>Peterson v.</u>

<u>Highland Music, Inc.</u>, 140 F.3d 1313, 1323 (9th Cir. 1998) (citations

and internal quotation marks omitted) (emphasis added)).  Logically

then, Elazar's violation of this court's orders is a necessary

predicate to a finding of contempt against any of the five

respondents.  <u>See</u> <u>Red 1 Investments, Inc. v. Amphion International</u>

<u>Ltd.</u>, 2007 WL 3348594, at *2 (E.D. Wash. Nov. 9, 2007) ("[A] non-

party who is alleged to have acted in concert to aid and abet a

violation of an injunction can be held in contempt only upon the

'predicate' finding that the enjoined party has violated the

order.") (quoting <u>Levin v. Tiber Holding Corp.</u>, 277 F.3d 243 (2d

Cir. 2002) (citations omitted) (reversing district court's contempt

finding because an underlying violation of the consent decree was

not proven and hence there was no offense to aid and abet); <u>Alemite</u>

<u>Mfg. Corp. v. Staff</u>, 42 F.2d 832, 832-33 (2d Cir. 1930) (L.Hand,

J.) ("[N]o court can make a decree which will bind any one but a

party[.] . . .  Thus, the only occasion when a person not a party

may be punished [for contempt], is when he has helped to bring

about . . . what [the decree] has [the] power to forbid[.]") Thus,

although Fidelity is not seeking an order of contempt against

---

suffice. . . . Generally, a violation is shown by the party's
failure to take all reasonable steps within the party's
power to comply. . . . Willfulness is not an element of contempt.

<u>Fidelity I</u>, 2009 WL 890471, at *7 (citations and internal quotation marks omitted).

Elazar, it is necessary to consider whether the record supports a finding that he violated either of the court's orders.

### 1. Yariv Elazar

#### a. Subpoena

Mr. Elazar credibly testified that he received the first page of the October, 2006 subpoena and another page with the caption of this action on it, but not the accompanying "**DOCUMENT REQUESTS**" page. Tr. I (doc. 288) at 54-57 (emphasis in original). Among the documents requested on that page were "Any agreements, transactions, or communications between [him] and *Eliani* LLC, including but not limited to loans, promissory notes, security agreements, and contracts." Pl. Exh. 1-3 (emphasis added). Because Eliani is not a party to this action, and hence not named in the caption, Mr. Elazar was unaware from the subpoena and the caption that Fidelity was seeking information from him regarding his relationship with Eliani. Tr. I (doc. 288) at 56-57. The foregoing is uncontroverted. Therefore, because Mr. Elazar did not have actual notice from the subpoena that he was to produce Eliani-related documents, such as the Deed Release, he cannot be held in contempt for failing to do so.

It is a closer call as to whether Elazar took all reasonable steps in otherwise responding to the October, 2006 subpoena. Elazar told the Meshkatais, as well as attorney Hyman, that he had received the subpoena and provided documents to Fidelity. Id. at 96. Elazar faxed documents to what he believed to be Fidelity's FAX number. Id. at 86-89. The record does not establish, however, that Elazar took any actions to verify that Fidelity actually received those faxed documents. Obviously, if Fidelity had

received them, it would not have filed a motion to compel against Elazar. Faxing documents to an unknown FAX number, as did Elazar, id. at 114-115, and never following up to verify receipt, does not amount to taking all reasonable steps to comply with a subpoena. Based upon the foregoing, except for the Deed Release, the record supports a finding - consistent with the order to compel -- that given the manner in which Elazar responded to the 2006 subpoena, he engaged in contemptuous conduct.

### b. Order to Compel

Conversely, the record does not support a finding of contemptuous conduct by Elazar as to the order to compel. The court issued that order on February 7, 2007, but Elazar did not receive a copy of it then. Id. at 67. Elazar was thus unaware that the court had ordered him to produce documents responsive to the subpoena, and that he had been ordered to pay sanctions. Id. at 60 and 67. In keeping with his testimony that he never hired attorney Hyman to represent him in this matter, Elazar further testified that he was unaware that on February 21, 2007, Hyman provided to Fidelity, purportedly on Elazar's behalf, roughly 400 pages of documents. Id. at 70-73.

Eventually, in response to an April 8, 2008 subpoena duces tecum issued to Mr. Elazar at Fidelity's behest, at his May 8, 2008 deposition Elazar produced the lone document which is the subject of this proceeding - the Deed Release. Id. 77-79. Although Eliani is not among the 35 "persons" identified in the attached document request, the requested documents also pertain to "any affiliated entity" of those persons, such as Eliani. Pl. Exh. 17-3 - 17-6. The record as presently constituted establishes that Elazar did not

have notice that he was to produce any Eliani-related documents

until he received that subpoena *duces tecum*.  Accordingly, Fidelity

has not met its burden of showing that Elazar violated the order to

compel.

To summarize, the record supports a predicate finding of

contempt by Elazar as to the subpoena, although not in terms of the

Deed Release.  On this record Fidelity has not shown, however, that

Elazar  engaged in contemptuous conduct with respect to the order

to compel.  Nonetheless, the court will assume such a finding for

the sake of analysis.

### C.  Legal Standards - Respondents

In light of the preceding analysis, the next issue is whether

any of the respondents abetted Elazar in violating either or both

of the court's orders, or whether they are "legally identified"

with him, such that his contemptuous conduct can be imputed to

them.  There is a paucity of case law as to what constitutes

abetting for purposes of finding a non-party in civil contempt.

The court will therefore borrow Black's Law Dictionary definition

of abet, recognizing that that definition is in the criminal

context.  That Dictionary defines abet as "aid[ing], encourag[ing],

or assist[ing] (someone), . . . in the commission of" an act, or

support[ing] . . . by active assistance[.]"  Black's Law Dictionary

(8th ed. 2004).

In contrast to abetting a contemnor, there is case law, albeit

scant, as to what it means for a non-party to be "legally

identified" with a contemnor.  It is well settled that "[a]n order

to a corporation or other entity binds those who are legally

responsible for the conduct of its affairs."  U.S. v. Laurins, 857

- 21 -

F.2d 529, 535 (9th Cir. 1988) (citations omitted)  Relying upon that

principle, in United States v. Montgomery Global Advisors V LLC,

2006 WL 950101 (N.D.Cal. Mar. 2, 2006), although the contempt order

was directed solely to a corporate defendant, the court found that

the managing member could be held personally liable for that

defendant's contempt.  Id. at *2.  The court reasoned that "as the

managing member of [the corporate defendant], clearly [that member]

had and continues to have the ability to act on behalf of that

entity and is therefore legally identified with it."  Id.; see also

NLRB v. Sequoia Dist. Council of Carpenters, 568 F.2d 628, 633 (9th

Cir. 1977) ("It can hardly be argued that the principal officers of

a labor union are not legally identified with it, and thus liable

in contempt for disobeying an order directed to the union.")

    1st Technology, LLC v. Rational Enterprises LTDA, 2008 WL

4571057, at *8 (D.Nev. July 29, 2008), adopted and affirmed, 2008

WL 4974580 (D.Nev. Nov. 21, 2008), is particularly instructive in

that it addresses the burden of proof issue.  The plaintiff there

sought an OSC why a non-party, Bodog IP Holdings, "should not be

held in contempt for [defendant] Bodog.com's failure or refusal to

comply with the Court's discovery order."  Id. at *8.  The court

found that "if Defendant Bodog.com was and is a 'd/b/a' of Bodog IP

Holdings, which is legally responsible for its compliance with the

discovery order, then Bodog IP Holdings is potentially subject to

contempt for Bodog.com's failure or refusal to comply with the

Court's order."  Id.  Significantly, the court held that "[t]he

burden is upon Plaintiff to show that Bodog.com is a d/b/a of Bodog

IP Holdings."  Id.  Due to "insufficient evidence or information"

to establish that d/b/a relationship, the 1st Technology court

- 22 -

declined to issue an order to Bodog IP Holdings to show cause why
it should not be held in contempt. Id. That ruling was without
prejudice "to Plaintiff demonstrating facts or evidence which would
support an issuance of an [OSC] to Bodog IP Holdings." Id. Of
course, in the present case, Fidelity has had more than ample
opportunity to obtain and marshal the evidence to establish legal
identity.

### 1. The Trust

As previously discussed, this court lacks personal
jurisdiction over the Trust because it was not properly served with
the OSC in accordance with Fed. R. Civ. P. 4.1. Even assuming
arguendo that this court has personal jurisdiction over the Trust,
Fidelity has not met its burden of showing that the Trust should be
held in contempt for violating this court's orders.

In the first place, Fidelity has not met its burden of showing
that the Trust abetted Elazar in violating those orders. Fidelity
has not shown that the Trust had any involvement in Elazar's
production of the subpoenaed documents. Mr. Elazar testified
several times that he acted alone in producing the subpoenaed
documents. Further, as already noted, Mr. Elazar believed that he
was to provide documents pertaining to only the parties named in
the caption of this action. The Trust is not one of those parties.
Therefore, it would have made no sense for the Trust to have been
aiding or assisting Elazar in responding to that subpoena. The
absence of record proof connecting the Trust to Elazar's October
2006 document production, precludes a finding that the Trust
abetted Elazar in that production. There is a similar lack of
proof in terms of the Trust abetting Elazar in violating this

court's order to compel. The court thus finds that Fidelity has not met its burden of showing that the Trust abetted Elazar in violating either of this court's prior orders.

Interestingly, despite arguing that "[t]he Trust is legally identified with Eliani and Farid and Anita Meshkatai[,]" Fidelity did not explicitly argue that the Trust was legally identified with Elazar. Reply (doc. 222) at 7:2-3. However, because the court has just found that the Trust cannot be held liable for abetting contempt, it will briefly consider whether the Trust could be held liable on the theory that it is legally identified with Elazar. As with abetting, Fidelity also has not met this burden of proof.

Fidelity makes much of the fact that the Trust was the funding mechanism for Eliani. Mr. Elazar, in turn, had a joint venture with Eliani for real estate development of three properties. Tr. I (doc. 288) at 40; 42-44; see also Pl. Exh. 11-257-259. That funding does not establish that the Trust is legally identified with Elazar absent a showing by Fidelity that the Trust was "legally responsible" for Mr. Elazar's individual or personal "affairs." See Laurins, 857 F.2d at 553. Likewise, Fidelity has not shown that the Trust "had and continues to have the ability to act on behalf of" Elazar individually or personally. See Montgomery Global, 2006 WL 950101, at *2. Hence, regardless of whether the focus is upon the subpoena or the order to compel, Fidelity has not met its burden of showing that the Trust is legally identified with Elazar such that the Trust should be held in contempt for Elazar's violations, if any, of this court's prior orders.

. . .

### *2. Anita Meshkatai*

For the same reasons discussed above as to the Trust, the court finds that Fidelity also has not met its burden of showing that Mrs. Meshkatai was legally identified with Mr. Elazar. Nor has Fidelity met its burden of showing that Mrs. Meshkatai abetted Elazar in violating this court's orders. There is no proof that in October 2006 Mrs. Meshkatai assisted Mr. Elazar in any way in responding to the subpoena. Again, Mr. Elazar acted alone when he faxed the documents to what he believed to be Fidelity. Given that lack of proof, clearly the record does not support a finding that Mrs. Meshkatai "aided, encouraged, assisted, or supported by active assistance," Mr. Elazar in responding to that subpoena. See Black's Law Dictionary (8th ed. 2004).

Although Mrs. Meshkatai received the order to compel, she never instructed Mr. Elazar to take any action with respect thereto. Tr. II (doc. 305) at 99. Moreover, according to Mrs. Meshkatai, Elazar never asked her about the order. Id. at 99-100. Mrs. Meshkatai did recall a "casual conversation" with Mr. Elazar in February, 2007, shortly after the issuance of the order to compel. Id. at 120. The purpose of that conversation was not to get Elazar's assistance in producing documents to comply with that order, however. Id. Consequently, even if the court were to find Elazar in contempt with respect to the order to compel, Fidelity has not met its burden of showing that Mrs. Meshkatai abetted that contempt.

### *3. Attorney Campbell*

As with the other respondents, the court's focus is upon whether attorney Campbell was "legally identified" with Elazar or

whether he abetted Elazar in violating the subpoena or the order to compel.

### a. *Subpoena*

In October 2006, when Elazar responded to the subpoena by faxing documents to what he believed to be Fidelity, he had no connection with attorney Campbell. Prior to that time, Campbell did notify Fidelity that he was representing the Meshkatais; but there is no mention of Elazar. Def. Exh. 34 at 1. It is easy to see why Elazar is not mentioned in that letter. As Mr. Campbell explained his role to Fidelity then, he was "assuming the representation" of the Meshkatais from another attorney in connection with judgment debtors' examinations. Id. In any event, although Elazar was completely unaware of it, attorney Campbell did not file a Notice of Appearance on Elazar's behalf until December 4, 2006 – a couple of months after Elazar responded to the subpoena. See Tr. I (doc. 288) at 64; and Pl. Exh. 7. Consequently, Fidelity has not shown, as it must, that attorney Campbell was legally identified with Elazar when Elazar responded to the subpoena in early October 2006. The only way then in which Mr. Campbell could be found in contempt as to the subpoena is if he abetted Mr. Elazar in violating it. Given Mr. Elazar's repeated and uncontroverted disavowal of any association with Mr. Campbell during the relevant time frame, plainly Campbell did nothing to abet Elazar's actions.

Further, even if Campbell became legally identified with Elazar through the filing of December 4, 2006, Notice of

Appearance,[11] Campbell cannot be held in contempt based upon Elazar's actions prior to that date, *i.e.*, Elazar's faxing of documents in October 2006 to an entity he believed to be Fidelity, and failing to verify receipt.

Moreover, Campbell's actions after the filing of the Notice of Appearance do not constitute abetting Mr. Elazar in violating the subpoena. On behalf of Mr. Elazar and the Meshkatais, attorney Campbell did file a response to Fidelity's motion to compel compliance with the October, 2006 subpoena. See Pl. Exh. 8. Once a party such as Fidelity files a motion, LR Civ 7.2(c) expressly allows for the filing of a responsive memorandum. There simply is no basis for finding that the filing of a response to a motion to compel, in accordance with the Local Rules, constitutes abetting a violation of a subpoena. Thus, attorney Campbell cannot be found in contempt for abetting a violation of the subpoena, even if he became legally identified with Elazar in December 2006.

### b. Order to Compel

Next the court must consider whether Fidelity has shown that Mr. Campbell was legally identified with Elazar for purposes of the order to compel, or, assuming a violation of that order by Elazar, whether Campbell abetted him in that violation. Fidelity has shown neither. Again, not until his May 2008 deposition did Mr. Elazar become aware of attorney Campbell's purported representation of Elazar. Therefore, the court is hard pressed to find that for

---

[11] Seemingly the filing of a notice of appearance would mean that that attorney and that client are "legally identified." Mr. Elazar emphatically testified that he never hired or authorized attorney Campbell to respond or object to the subpoena, however. See, e.g., Tr. I (doc. 288) at 56-57; and 63. Under these circumstances, Campbell's filing of a notice of appearance does not result in a finding that he was legally identified with Elazar at that time.

contempt purposes Campbell was legally identified with Elazar in terms of the order to compel. Likewise, because cumulatively the evidence shows that attorney Campbell did not have any contact with Mr. Elazar regarding the order to compel, he could not have abetted Elazar in any violation thereof. Not only that, but the evidence outlined below easily supports the reasonable inference that Mr. Meshkatai and attorney Hyman were orchestrating the document production in response to the order to compel.

After learning of the order to compel, attorney Campbell advised Mr. Meshkatai and attorney Hyman. Tr. II (doc. 305) at 266. In the approximately two weeks between issuance of the order to compel and production of the documents by attorney Hyman, Mr. Campbell testified that he and Ms. Hemann, an associate in his office, had several communications with Mr. Meshkatai. Id. at 265-272. During that time, Mr. Meshkatai informed Campbell that, through attorney Hyman, Mr. Meshkatai would be producing the documents responsive to the order. Id. at 268. Other record evidence, discussed below, demonstrates that the documents were produced in accordance with Mr. Meshkatai's direction. There is simply no credible proof that attorney Campbell abetted Elazar in violating the order to compel.

### 4. Farid Meshkatai and Allen Hyman[12]

As the record demonstrates, Mr. Meshkatai and Mr. Hyman had integral and closely intertwined roles in responding to the Elazar subpoena and the resultant order to compel. Therefore, the court

---

[12] For the sake of argument, the court assumes that it may properly exercise personal jurisdiction over Mr. Hyman, despite the lack of proper service, as discussed earlier. Also for the sake of argument, the court continues to assume that Mr. Elazar violated the order to compel.

1  will jointly address the evidence as to them.

2  ### a. "Legally Identified"

3  Undisputably, Messrs. Elazar and Meshkatai have a close
4  business relationship.  Mr. Meshkatai is a manager of Eliani - a
5  joint venture to which Mr. Elazar is a party.  Tr. I (doc. 288) at
6  40; 42-44; see also Pl. Exh. 11-257-259.  Nevertheless, that
7  business relationship does not translate to a finding that Mr.
8  Meshkatai is legally identified with Mr. Elazar for contempt
9  purposes.  There has been no showing by Fidelity, who has the
10 burden of proof on this issue, see 1st Technology, 2008 WL 4571057,
11 at *8, that Mr. Meshkatai is legally responsible for the affairs of
12 Mr. Elazar individually.  Fidelity also has not demonstrated that
13 Mr. Meshkatai "had and continues to have the ability to act on
14 behalf" of Mr. Elazar so as to be legally identified with Elazar.
15 See Montgomery Global, 2006 WL 9501, at *2.  The result may well
16 have been different if Fidelity had served Mr. Elazar with a
17 subpoena directed to Eliani, but it did not.  There is no basis on
18 the record as presently constituted  for finding that Mr. Meshkatai
19 is "legally identified" with Mr. Elazar with respect to this
20 court's orders.  Thus, Mr. Meshkatai cannot be found in contempt on
21 that basis.

22 Although for a different reason, attorney Hyman also cannot be
23 found in contempt for being "legally identified" with Mr. Elazar.
24 As with attorney Campbell, based upon Mr. Elazar's credible
25 testimony that he never authorized attorney Hyman to represent him
26 or in any way act on his behalf, there is no basis for finding that
27 Hyman is "legally identified" with Mr. Elazar.  Consequently, Mr.
28 Hyman cannot be found in contempt on that basis.

- 29 -

### *b. Abetting*

The evidence paints a troubling picture, though, as to Mr. Meshkatai's and attorney Hyman's conduct surrounding the subpoena and the order to compel.  Basically, without Mr. Elazar's knowledge or consent, attorney Hyman and Mr. Meshkatai took it upon themselves to orchestrate how to respond to the Elazar subpoena.  Also wholly without Elazar's knowledge or consent, attorney Hyman and Mr. Meshkatai  produced the documents in response to the order to compel.  They failed to produce the Deed Release which is at the center of this contempt proceeding, however.

### I.  Subpoena

Since 2006, attorney Hyman had been defending the Meshkatais in two parallel California federal court actions also commenced by Fidelity.  Tr. I (doc. 288) at 243-44.  As part of that defense, attorney Hyman managed the receipt and production of countless documents.  Id. at 215-16.  By February 2007, Hyman estimates that he had produced between 5,000 - 10,000 pages of Meshkatai documents and had received 16 banker's boxes of documents from Fidelity.  Id. at 232-233.  Attorney Hyman's office was, as Mr. Meshkatai described it, the "center of [document] production" for all Fidelity-related document requests, and Hyman "was in charge of all the subpoenas[.]" Id. at 245; and 258; see also Tr. II (doc. 305) at 108.  Attorney Hyman unconvincingly attempted to diminish his role in the document production in the two parallel California actions.  Testimony pertaining to the scope of Fidelity's requests and the volumes of documents provided to Hyman significantly undermines Hyman's testimony on this point.

Given attorney Hyman's heavy involvement in the California

document requests, the court finds credible the testimony that after Elazar told Mr. Meshkatai about the subpoena in this action, Mr. Meshkatai asked Elazar for the subpoena and then immediately contacted Hyman.  See id. at 85; 107;  245; and 267-68.  In turn, attorney Hyman requested that Mr. Meshkatai fax the subpoena to him so Hyman could discuss it with Elazar.  Id. at 267-269.  During their phone conversation, Elazar told Hyman that he had already faxed documents to Fidelity; and he identified those documents. Id.  at 87.

Knowing that Elazar had already produced documents responsive to the subpoena, on October 19, 2006, unbeknownst to Mr. Elazar, Mr. Hyman wrote Fidelity informing it that his "office represents Variv [sic] Elazar[,]" and outlining Hyman's objections to the subpoena.  Pl. Exh. at 2-1-2.  In a November 7, 2006, letter to Fidelity also pertaining to the subpoena, Hyman reiterated that he "represent[s] Variv [sic] Elazar[.]" Pl. Exh. 3-1.  Although Mr. Meshkatai denied "hir[ing] [Mr.] Hyman to do any work for [Mr.] Elazar[,]" it strains credulity to believe that Mr. Hyman would have written those letters on his own volition.  See Tr. I (doc. 288) at 244-45.  The evidence as whole supports the reasonable inference that Mr. Hyman wrote those letters at Mr. Meshkatai's behest.

Moreover, there is no reason to believe that Mr. Elazar hired Hyman or otherwise authorized him to act on his behalf with respect to the subpoena.  Not only did Elazar credibly deny having hired Hyman, it would have been illogical for him to have done so when he did not object to producing, and in fact did produce, the documents in his possession responsive to the subpoena.  Id. at 57.  The only

reasonable inference on this record is that at Mr. Meshkatai's behest attorney Hyman undertook Mr. Elazar's representation as to the subpoena. Bolstering this conclusion is the business relationship between Mr. Elazar and Mr. Meshkatai. It is not as though Mr. Meshkatai was requesting that attorney Hyman represent the interests of a complete stranger. According to attorney Hyman, Mr. Meshkatai gave him a check, drawn on an Eliani account, to pay the sanctions for Mr. Elazar because Elazar was a "good friend" and Mr. Meshkatai believed he was somewhat responsible for the order to compel. Id. at 180.

Partly because of Mr. Hyman's evasiveness, it is less clear whether he or Mr. Meshkatai, or perhaps both, sought to have attorney Campbell represent Mr. Elazar in responding to the motion to compel. See id. What is clear is that as with attorney Hyman, at no time did Mr. Elazar hire attorney Campbell or otherwise authorize Campbell to act on his behalf. In fact, Elazar testified that Mr. Meshkatai never informed him that Fidelity had filed a motion to compel with respect to the Elazar subpoena. Id. at 131. Instead, at Mr. Meshkatai's request, attorney Hyman provided Campbell with materials to prepare a response to the motion to compel. See Hyman exh. 36; see also Tr. I (doc. 288) at 166; 168 and 212. Consequently, attorney Campbell's response to Fidelity's motion substantially mirrors attorney Hyman's initial objections to Fidelity.

The court does not condone the involvement of Messrs. Hyman and Meshkatai in the Elazar subpoena. Their conduct comes perilously close to abetting contempt as to that subpoena. Perhaps the most significant reason why Mr. Meshkatai's conduct borders on

abetting is that, unbeknownst to Mr. Elazar, he facilitated attorney Hyman's representation of Elazar. That representation, in turn, set off a chain of events ultimately resulting in the order to compel and sanctions against Mr. Elazar. Attorney Hyman was complicit in Mr. Meshkatai's action, although perhaps unwittingly. At the end of the day, however, the court is forced to conclude that Fidelity has not met its burden of proving by clear and convincing evidence that either Mr. Hyman or Mr. Meshkatai abetted Elazar in violating the subpoena.

### ii. *Order to Compel*

In granting Fidelity's motion to compel on February 7, 2008, this court ordered Mr. Elazar to produce documents responsive to the subpoena, and to pay Fidelity $1,170.00 in sanctions. Pl. Exh. 9-9. Many documents were produced in accordance with that order, but not by Mr. Elazar. The sanctions were also paid, but not by Mr. Elazar. Instead, again without Mr. Elazar's knowledge or consent, attorney Hyman and Mr. Meshkatai produced those documents and paid the sanctions. They did so without informing Elazar, who did not become aware of that order until well after its issuance. See, e.g., Tr. I (doc. 288) at 67-68; 132; and 141. Likewise, at his May 2008 deposition, Mr. Elazar first learned that the sanctions against him had been paid by Eliani. Id. at 73-74.

Rather than consulting with Mr. Elazar about the order to compel, on February 21, 2007, attorney Hyman directly provided Fidelity with roughly 400 pages of documents. Pl. exh. 11. Mr. Hyman advised Fidelity that he was "provid[ing]" those "documents . . . in response to the subpoena of documents to Yariv Elazar." Id. at 11-1. Hyman further requested that Fidelity review those

documents and that "if any concerns remain," Fidelity should "contact this [Hyman's] office." <u>Id.</u> Critically, this letter was sent without Mr. Elazar's authorization, and Elazar did not provide those documents. Tr. I (doc. 288) at 71; and 72. What is more, after receiving the documents, attorney Hyman candidly admitted that he did not review them. <u>Id.</u> at 228. In his words, Hyman simply "[b]ate[s] stamped the[] [documents] and sent them on[]" to Fidelity. <u>Id.</u>

Attorney Hyman did equivocate in terms of who was the source of those documents – Mr. Meshkatai, Mr. Elazar and/or attorney Campbell. <u>See</u> <u>id.</u> at 173; 202; and 227. Based upon the record as a whole and the demeanor of the witnesses, although Mr. Meshkatai flatly denies it, <u>id.</u> at 250, the court finds that he was the source of those documents. Mr. Meshkatai's denial is incredulous for several reasons. First, given his active role in all aspects of document production in this and the two California actions, <u>see</u>, <u>e.g.</u>, <u>id.</u> at 246; and at 252-53, the court is hard pressed to believe that Mr. Meshkatai suddenly decided to relinquish all control to Mr. Hyman. It makes no sense that Mr. Meshkatai, who had been involved with the Elazar subpoena almost from the outset, would take a back seat and wholly defer to attorney Hyman.

Another reason for disbelieving Mr. Meshkatai when he denies providing documents to attorney Hyman is that at that time, in February 2007, Mr. Meshkatai explained that he was providing documents to Hyman in both California actions. <u>Id.</u> at 252-253. Given the sheer volume of documents which Mr. Meshkatai was turning over to attorney Hyman then, and his ongoing involvement in discovery in those parallel actions, it is easy to see how Mr.

Meshkatai might be confused as to exactly what documents he provided to attorney Hyman with respect to the Elazar subpoena.

Viewing the record as a whole, however, the court finds that even assuming (1) contempt by Elazar, and (2) personal jurisdiction over Hyman, Fidelity has not met its stringent burden of showing that attorney Hyman or Mr. Meshkatai abetted a violation of the order to compel. Both treaded dangerously close to abetting contempt of that order, but Fidelity was unable to show that Mr. Meshkatai or attorney Hyman crossed that fine line. At best, Fidelity's proof may have satisfied the preponderance of the evidence standard, but that is not enough. See Fidelity I, 2009 WL 890471, at *7 (citations omitted). Fidelity must satisfy the higher, clear and convincing evidence standard; it has not done that. See id. at *7 (citations omitted).

Mr. Meshkatai has taken a no-holds-barred approach in attempting to thwart Fidelity's collection efforts, including engaging in contemptuous conduct in the related California actions. Indeed, neither he nor attorney Hyman are strangers to contempt proceedings. See, e.g., Pl. Exh. 57 (Mr. Meshkatai found in civil contempt for failing to produce document and ordering payment to Fidelity of $8,175.00 in sanctions); and Pl. Exh. 58 (footnote omitted) (finding Messrs. Meshkatai and Hyman "jointly and severally liable for . . . contempt sanctions" and awarding Fidelity "$39,717.50 in sanctions[]"); and RJN (doc. 268), exh. 18 thereto at 140 (listing contempt findings as to Mr. Meshkatai); and RJN (doc. 268), exh. 15 thereto (RICO court finding Mr. Meshkatai, among others, in contempt for violating an asset freeze preliminary injunction order). Consequently, it is understandable that in this

action Fidelity would view the conduct of Messrs. Hyman and Meshkatai through that prism. Skepticism and innuendo are no substitute for clear and convincing proof of abetting contempt. As earlier noted, it was incumbent upon Fidelity in the first instance to make out a *prima facie* showing of contempt. Fidelity did not do that.

To summarize, at nearly every step of the way there are deficiencies in Fidelity's proof. First, it did not establish that this court has personal jurisdiction over the Trust or attorney Hyman. Second, it did not show that Mr. Elazar should be held in contempt for violating this court's orders – a necessary predicate to a finding of contempt by any of the five respondents. Third, Fidelity has not shown that any of the respondents were legally identified with Mr. Elazar, or that they abetted him, such that any contempt by him should be imputed to respondents. In light of the foregoing, there is no legal or factual basis for finding that any of the five respondents should be held in contempt for violating the October 2006 subpoena or the subsequent order to compel.

## *IV. Remedy*

Having found that none of the respondents can be held in contempt, the issue of remedies is moot.

## *Conclusion*

For the reasons set forth above, the court hereby ORDERS that:

(1) the Request for "Motion for Discharge of the O.S.C." by Allen Hyman (doc. 264) is GRANTED;

(2) Request to Take Judicial Notice by Allen Hyman is GRANTED (doc. 268); and

(3) Fidelity's Order to Show Cause seeking to hold in contempt

defendants, The Anna and Noach Kramer Irrevocable Insurance Trust;

Anita Meshkatai, individually and as trustee of the Anita Kramer

Living Trust, dated July 23, 1987; and Farid Meshkatai; and non-

parties, Daniel Campbell and Allen Hyman is in all respects DENIED.

DATED this 12th day of March, 2010.


_____
Robert C. Broomfield
Senior United States District Judge




Copies to counsel of record; attorneys Daniel Campbell; Allen Hyman

and Denise O'Rourke