**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Fidelity National Financial, )
Inc., a Delaware corporation, )
*et al.*, )
               Plaintiffs, )
             )
      vs. )
             )
Colin H. Friedman, )
individually and as trustee )
of the Friedman Family Trust )
UDT, dated July 23, 1987; )
Hedy Kramer Friedman, )
individually and as trustee )
of the Friedman Family Trust )
UDT, dated July 23, 1987; )
Farid Meshkatai, an )
individual; and Anita Kramer )
Meshkatai, individually and )
as trustee of the Anita )
Kramer Living Trust, dated )
July 23, 1987, )
             )
          Defendants. )
_____)

No. CIV 03-1222 PHX RCB

O R D E R

## ***Introduction***

In <u>Fidelity Nat. Financial, Inc. v. Friedman</u>, 2009 WL 890471,

(D.Ariz. March 31, 2009) ("<u>Fidelity I</u>"), this court, *inter alia*,

1  granted a motion by plaintiffs, Fidelity National Financial, Inc.

2  and Fidelity Express Network, Inc. ("Fidelity"), for an Order to

3  Show Cause ("OSC") as to why defendants Farid and Anita Meshkatai,

4  and the Kramer Insurance Trust ("the Trust") and non-parties,

5  Daniel Campbell, and Allen Hyman,[1] should not be held in civil

6  contempt for alleged violations of an October, 2006 subpoena to

7  non-party, Yariv Elazar, and subsequent order to compel, _Fidelity_

8  _Nat. Financial, Inc. v. Friedman_, 2007 WL 446134 (D.Ariz. Feb. 7,

9  2007).[2]  Fidelity's theory is that this alleged contempt is part

10 of a larger scheme by the Meshkatai defendants and others to

11 fraudulently transfer assets to avoid Fidelity's attempts to

12 collect on its nearly $8.5 million judgment against all of the

13 defendants herein.

14      Because "it would be impermissible to resolve the issue of

15 civil contempt based solely upon the competing affidavits,

16 declarations and other filed documents[,]" _Fidelity I_, 2009 WL

17 890471, at *8, the court held an evidentiary hearing. After

18 carefully considering the evidence, including the testimony of

19 eight witnesses, and the respondents' respective arguments, the

20 court rules as follows.

21 . . .

26      [1]   For ease of reference, unless necessary to distinguish among them, the
   above-named individuals and the Trust collectively will be referred to throughout
27 as "the respondents."

28      [2]   The court assumes familiarity with _Fidelity I_ and that order to compel,
   and incorporates by reference the relevant portions of those earlier decisions.

## _Discussion_[3]

## _I.  Personal Jurisdiction_

There is a threshold issue as to personal jurisdiction.  Two non-parties, "The Anna and Noach Kramer Irrevocable Insurance Trust ("the Trust")" and attorney Allen Hyman, are contesting personal jurisdiction.  It is critical to resolve that issue at the outset because "[p]ersonal jurisdiction. . . is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication."  Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 583, 119 S.Ct. 1563, 1570, 143 L.Ed.2d 760 (1999) (citation and internal quotation marks omitted); see also Wells v. Kearney, 2009 WL 2568635, at *9 (D.Ariz. Aug. 18, 2009) (citation and internal quotation marks omitted) ("Because a court without jurisdiction over the parties cannot render a valid judgment, [the court] must address Defendants' personal jurisdiction argument before reaching the merits of the case.") This is equally true in the contempt context.  See  Hilao v. Estate of Marcos 94 F.3d 539, 545 (9th Cir. 1996) ("Estate III") (citation

---

[3]     There are two preliminary issues which need not detain the court for long.  The first is a Request for Judicial Notice ("RJN") by Mr. Hyman (doc. 268), which is unopposed.  That RJN, pertaining to 20 separate documents, includes court orders; docket reports, or portions thereof, filed in this and other related actions; a Local Rule of this court; and several notices of motion filed in other related actions.  Plainly those documents are all matters of public record.  Therefore, pursuant to Fed. R. Evid. 201 the court grants in its entirety Mr. Hyman's RJN,  and will consider those exhibits to the extent necessary to resolve this OSC.  See, e.g., Rein's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice, as a matter of public record, "pleadings, memoranda, expert reports, etc., from [earlier] litigation[,]" which were thus "readily verifiable").

Second, during the hearing the court took under advisement the admission of two exhibits.  The first is a February 8, 2007, e-mail from Ms. Hemann, an associate in attorney Campbell's office (def. exh. 54).  The second is a declaration in a related matter from the Trust's former Trustee, Steven Spector (def. exh. 37).  The objections to both exhibits are not well founded.  See Hearing Transcript (doc. 288) ("Tr. I") at 147-49; and 156-58.  Thus, the court will receive these exhibits.  As will be seen, however, neither exhibit is necessary to resolving the contempt issues herein.

- 3 -

and internal quotation marks omitted) ("It is essential to the power to punish for contempt that the court . . . have jurisdiction of the person.")

"As [t]he personal jurisdiction requirement recognizes and protects an individual liberty interest, . . . , it can, like other such rights, be waived." Dow Chemical Co. v. Calderon, 422 F.3d 827, 831 (9th Cir. 2005) (citations and internal quotation marks omitted). "[B]ecause the personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court." Id. (citations and internal quotation marks omitted). In the present case, as to the Trust, Fidelity argues that it waived its right to contest personal jurisdiction due to the untimely filing of the Trust's response to Fidelity's OSC motion. Fidelity further asserts that because it petitioned for relief in the Superior Court of Arizona, Maricopa County, the Trust consented to personal jurisdiction in this court. Both arguments are unavailing.

### A. Waiver

Initially, in opposing Fidelity's motion for an OSC, the Trust explicitly raised the issue of lack of personal jurisdiction. "[F]ind[ing] the Trust's personal jurisdiction arguments 'premature' because [the court] deem[ed] the process to be the OSC, which . . . ha[d] not yet issued[,]" the court left "for another day the Trust's" lack of personal jurisdiction argument. Fidelity I, 2009 WL 890471, at *6.

Although from the outset the Trust expressly asserted lack of personal jurisdiction, Fidelity insisted that the Trust waived the

- 4 -

right to contest personal jurisdiction because of the Trust's untimely response to the OSC motion. See Reply (doc. 222) at 2, § II(A). This court denied Fidelity's motion to strike the Trust's objection as untimely though. See Fidelity I, 2009 WL 890471, at *6. A logical corollary of that holding is that the court will not find a waiver of personal jurisdiction on the basis of untimeliness.

Attorney Bass has been representing the Meshkatais in this action since August, 2008. See Docs. 208 and 209. From that time until the OSC hearing, every filing by Mr. Bass and every appearance by him was solely on behalf of the Meshkatais. See e.g., Docs. 216; 217; and 229. Likewise at the status conference setting a date for the OSC hearing, Mr. Bass appeared on behalf of the Meshkatais and Anita Meshkatai, as Trustee of the Anita Kramer Living Trust, dated July 23, 1987 - also a party to this action. Doc. 258 at 2:14-15; and at 8:13-21. At that conference, however, no attorney appeared on behalf of the respondent Trust. Id. at 10:6-10.

Despite the foregoing, for the first time, at the OSC hearing attorney Bass indicated that he was representing the Trust. More specifically, Mr. Bass identified himself as "counsel for the Meshkatais and the party identified as the Trust in Your Honor's order." Tr. I (doc. 288) at 5:10-12. Presumably, attorney Bass was referring to The Anna and Noach Kramer Irrevocable Insurance Trust, as explained in Fidelity I, 2009 WL 890471, at *1 n. 2.

The court declines to find that the Trust waived its right to contest personal jurisdiction based upon that purported appearance, however. In contravention of LRCiv 83.3, Mr. Bass never filed a

notice of appearance, a formal substitution or association of
counsel indicating that he was appearing as counsel of record on
behalf of the Trust.  <u>See</u> LRCiv 83.3 ("[N]o attorney shall appear
in any action or file anything in any action without first
appearing as counsel of record.  In any matter, . . . there must be
a formal substitution or association of counsel before any
attorney, who is not an attorney of record, may appear.") Indeed,
the only filings on behalf of the Trust were by attorney O'Rourke,
with the Phoenix, Arizona office of Lewis, Brisbois, Bisgaard &
Smith LLP -- not by attorney Bass.  <u>See</u>, <u>e.g.</u>, Doc. 204.  Given the
confused state of the record as to Mr. Bass' purported
representation of the Trust, combined with the Trust's initial
unequivocal objection to personal jurisdiction, the court declines
to find that the Trust waived its personal jurisdiction defense
based upon that supposed appearance at the OSC by attorney Bass.

   The court similarly finds that attorney Hyman's appearance at
the OSC did not constitute a waiver of his right to contest
personal jurisdiction.   In fact, Fidelity never suggested such a
waiver.  Perhaps that is because Mr. Hyman raised that
jurisdictional issue in his opposition to the OSC.  <u>See</u> Doc. 264 at
15.  Further, Mr. Hyman "especially appear[ed] for [him]self[]" at
the OSC hearing, and noted that in <u>Fidelity I</u> there had not been
any finding as to personal jurisdiction over him.  Tr. I (doc. 268)
at 5:17; at 160:14-15.  Given that the "technical distinctions
between general and special appearances have [long since] been
abolished" by enactment of the Federal Rules of Civil Procedure,
Mr. Hyman did not need to specify the nature of his appearance to
preserve the personal jurisdiction argument.  <u>See</u> <u>Hamilton v.</u>

1  <u>Willms</u>, 2007 WL 2904286, at *3 (E.D.Cal. Oct. 4, 2007).

2  ### *B. Consent*

3  Fidelity's consent argument is another of the personal

4  jurisdiction arguments which this court left in abeyance in

5  <u>Fidelity I</u>, 2009 WL 890471 at *6, and now must address.  Fidelity

6  premises its consent argument upon a 2005 Arizona state court

7  action.  In that action, then Trustee Steven Spector filed a

8  "Petition for Instructions, and to Confirm Interpretation of

9  Irrevocable Insurance Trust[,]" which the court granted.  Reply

10  (doc. 222), exh. 10 thereto at 86-90; and 101.  Defendant Anita

11  Meshkatai, among others, signed a declaration in support of that

12  Petition.  <u>Id.</u> at 97-98.

13  Based upon the foregoing, Fidelity maintains that by seeking

14  relief in an Arizona state court, the Trust consented to personal

15  jurisdiction in this federal district court action.  Fidelity does

16  not offer any legal support for its argument; perhaps that is

17  because there is none.  In fact, Ninth Circuit precedent is to the

18  contrary.

19  In <u>Dow Chemical Co. v. Calderon</u>, 422 F.3d 827 (9th Cir. 2005),

20  the Court held that defendants did not consent to personal

21  jurisdiction.  The Court found no consent even though defendants

22  had not objected to personal jurisdiction in a prior federal court

23  action involving a different plaintiff, but the same underlying

24  judgments.  <u>Id.</u> at 835-36.  In so holding, the Ninth Circuit

25  distinguished two decisions outside this Circuit holding that

26  "personal jurisdiction exists where a defendant also independently

27  seeks *affirmative* relief in a separate action before the **same court**

28  concerning the **same transaction or occurrence**."  <u>Id.</u> at 834 (bold

emphasis added).  The Ninth Circuit distinguished those cases on
the basis that the Dow Chemical defendants had not sought
affirmative relief in the first action, but instead were
defendants.  Id.  Moreover, in the first action defendants made a
choice to defend on the merits "only *after* they were haled into the
district court" by plaintiff in the prior action.  Id. at 836.  In
contrast, the Ninth Circuit reasoned, "[w]ithout an independent
affirmative decision to seek relief in our courts, there can be no
imputation of a conscious decision to settle all aspects of a
dispute here."  Id.

In the present case, the Trust is in a slightly different
position than the Dow Chemical defendants.  Nonetheless, Dow
Chemical mandates the same result here: the Trust did not consent
to personal jurisdiction in this federal court by proceeding with
that Arizona state court action.  Admittedly, the Trust petitioned
for affirmative relief in that prior state court action.  But
obviously the Trust was not seeking that relief before this federal
district court.  Further, the relief which the Trustee sought in
the Arizona state court action – instructions as to how to construe
the Trust  –  is wholly unrelated to the transaction or occurrence
at issue here – a contempt proceeding stemming from Fidelity's
attempt to execute on a foreign judgment.  Thus, based upon the
rationale of Dow Chemical, the court finds that Trust's prior
Petition to an Arizona state court does not establish that it has
consented to personal jurisdiction in this subsequent federal court
action.

Having rejected Fidelity's waiver and consent-based personal
jurisdiction arguments, the court must address the personal

jurisdiction issue on the merits.  See Ciolli v. Iravani, 625
F.Supp.2d 276, 292 (E.D.Pa. 2009) ("Because plaintiff may not rely
on Defendants' waiver for the exercise of personal jurisdiction, he
must establish general or specific personal jurisdiction over
Defendants.") Likewise, having found that attorney Hyman did not
waive personal jurisdiction by appearing at the OSC hearing, the
court also must address whether it has personal jurisdiction over
him.

### C. Merits

"*In personam* jurisdiction, simply stated, is the power of a
court to enter judgment against a person." S.E.C. v. Ross, 504
F.3d 1180, 1138 (9th Cir. 2007).  "The familiar 'minimum contacts'
test," adopted in the seminal case of Int'l Shoe Co. v. Washington,
326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), "coupled with
statutory authorization, provides a *basis* for an exercise of
jurisdiction[.]"  Id. (emphasis added by Ross Court).  On the other
hand, "service of process is the *mechanism* by which the court
[actually] acquires the power to enforce a judgment against the
defendant's person or property."  Id. (citation and internal
quotation marks omitted) (emphasis added by Ross Court).  Thus,
although often conflated, "[s]ervice of process is a distinct and
separate concept from the court's personal jurisdiction[.]" Rose v.
Miss Pacific LLC, 2009 WL 1688123, at *3 (D.Or. June 15, 2009).
Accordingly, "[w]ithout a proper basis for jurisdiction, or in the
absence of proper service *of process*, the district court has no
power to render any judgment against the defendant's person or
property unless the defendant has consented to jurisdiction or
waived the lack of process." Ross, 504 F.3d at 1138-1139

(citations omitted) (emphasis added).

Plainly then, before issuing an order of contempt against non-parties such as the Trust and Mr. Hyman, there must be a basis for the exercise of that jurisdiction and a mechanism by which this court can assert personal jurisdiction. For the moment, the court will limit its inquiry to whether the Trust and Mr. Hyman were properly served. As to service, quoting from one prominent commentary on the Federal Rules, the Ninth Circuit has stated, "'[w]hen it is sought to charge a person with contempt who was not a party to the original action and thus not already within the jurisdiction of the court, that party must be served with process as in any other civil action.'" Estate III, 94 F.3d at 545 (quoting 11A Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d § 2960 (1995)); accord Comverse, Inc. v. American Telecommunications, Inc. Chile S.A., 2009 WL 464446, at *2 n.4 (S.D.N.Y. Feb. 24, 2009) (citation omitted) (where it "appear[ed]" that the court lacked personal jurisdiction over non-parties because there was no evidence of proper service, the court was "[w]ithout personal jurisdiction" and could not "hold them in contempt[]").

In opposing Fidelity's motion for an OSC, the Trust specifically challenged whether this court has personal jurisdiction over it. See Trust's "Objection to Jurisdiction and Opposition" to Pl. OSC Mot. (doc. 204) at 3-6. The Trust's cursory analysis of that issue did not mention service of process at all. In the accompanying declaration of former Trustee Spector, however, he avers that "[t]he Trust was never served." Spector Decl'n (doc. 204) at 10, ¶ 7:18. Mr. Spector further questioned "[t]he

- 10 -

purported service on the non-existent . . . Kramer Insurance Trust[,]" which "consisted of service of Plaintiff's [OSC] Motion on [him], the Trustee of The Anna and Noach Kramer Irrevocable Insurance Trust." Id. at 10, ¶ 7:18-20. Lastly, Mr. Spector averred that "[t]o [his] knowledge there has been no service of a summons or any other means of properly bringing the Trust before this Court." Id. at 10, ¶ 7:20-22.

Fidelity counters that the Trust has no basis for disputing service because the OSC Motion was properly served upon the Trust in accordance with Ariz. R. Civ. P. 4.1(k)[4] and 4.2(h).[5] In particular, Fidelity notes that it personally served the OSC Motion upon Mr. Spector. Fidelity's Reply (doc. 222), Kroll Decl'n, exh. 1 thereto at 15. In addition, Fidelity disagrees with the Trust's contention that it must be served with a summons before this court has personal jurisdiction over the Trust.

Mr. Hyman vaguely mentions, in opposing Fidelity's OSC, that he is "rais[ing] objection[s] based upon jurisdiction and due process[,]" but he never expands upon that statement. Hyman Resp. (doc. 264) at 15:26-27 (emphasis omitted). Hyman merely states that Fidelity did not "undertake" to meet its burden "to insure

---

[4] That Rule states in relevant part that "[s]ervice upon a[n]. . . unincorporated association which is subject to suit in a common name, . . . , shall be effected by delivering a copy of the *summons* and of the pleading to a partner, an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the party on whose behalf the agent accepted or received service." Ariz. R. Civ. P. 4.1(k) (emphasis added).

[5] This Rule governs service upon, among others, "[u]nincorporated [a]ssociations [l]ocated [o]utside Arizona but [w]ithin the United States[.]" Ariz. R. Civ. P. 4.2(h). "[S]ervice under th[at] Rule shall be made on one of the persons specified in Rule 4.1(k)[,]" quoted in the preceding footnote. Ariz. R. Civ. P. 4.2(h).

that the Court's jurisdiction extended to [him][.]" Id. at 15:28-16:1. Hyman then immediately proceeded to argue why he should not be held in contempt.

Later in his opposition Hyman again alluded to the personal jurisdiction issue, broadly stating that "[t]here are . . . troubling issues that FIDELITY did not serve" the OSC on him "until April 23, 2009 by *email*."[6] Id. at 20:16-18 (italicized emphasis added); see also Hyman Decl'n (doc. 265) at 15, ¶ 68:6-8 (citing exh. 24 thereto). Again, Mr. Hyman did not elaborate. Despite the fact that it has the burden of proof as to personal jurisdiction, Haisten v. Grass Valley Medical Reimbursement Fund, Ltd., 784 F.2d 1392, 1397 (9th Cir. 1986), Fidelity did not respond to Mr. Hyman's lack of personal jurisdiction contentions, either at the OSC hearing or in its "Bench Brief" submitted in support of that hearing.

In any event, there is confusion here as to the manner in which service must be accomplished and the documents which must be served. Fidelity's argument that it properly served the OSC Motion upon the Trust, and thus the court has personal jurisdiction over the Trust are not germane in light of Fidelity I. In that decision, this court specifically found that the "process here" is the OSC itself, as opposed to Fidelity's motion or a summons. Fidelity I, 2009 WL 890471, at *6 (citation omitted). Thus, at this juncture it is irrelevant whether Fidelity properly served the Trust with the OSC Motion. It is likewise irrelevant that the

---

[6] As will be discussed above, the record shows that Fidelity attempted service of the OSC upon Mr. Hyman by overnight delivery, not by e-mail, as Mr. Hyman claims.

Trust was not served with a summons.  Instead, the focus is upon

whether Fidelity properly served the Trust with the OSC itself,

*i.e.* Fidelity I.

Because the process here is an OSC and not a summons, the

court must look to Rule 4.1(a).  That Rule governs the method for

service of  "[p]rocess . . . *other than* a summons under Rule 4 or a

subpoena under Rule 45[.] Fed. R. Civ. P. 4.1(a) (emphasis added).

Rule 4.1(a) "directs who shall make service – a U.S. marshal,

deputy marshal, or special appointee[.]"  Hilao v. Estate of

Marcos, 95 F.3d 848, 853 (9th Cir. 1996).  That Rule further

specifies "where that officer can make such service – anywhere

within the state in which the district court sits[.]" Id.   That

Rule is silent, however, as to "the manner in which service shall

be made (e.g., personally, by mail, etc.) or upon whom service

shall be made."  Id.   Therefore, in Hilao, a judgment enforcement

proceeding like the present action, the Ninth Circuit held that in

accordance with Rule 69(a)[7], "state law" provides "those latter

requirements for service[.]" Id.   When read together, the Hilao

Court found that although the judgment creditor complied with Fed.

R. Civ. P. 4.1, that did not excuse its failure to comply with

California law governing service on a financial institution in

---

[7]        Subsection (1) of that Rule provides that:

    [t]he procedure on execution – and in proceedings
    supplementary to and in aid of a judgment,
    and in proceedings on and in aid of judgment or
    execution – must accord with the procedure
    of the state where the court is located, but a
    federal statute governs to the extent it applies.

Fed. R. Civ. P. 69(a)(1). Fidelity invoked subsection (2) of that Rule in seeking
the order to compel which is one of the bases of this contempt proceeding.
Fidelity, 2007 WL 446134, at *2.

- 13 -

enforcement proceedings.

Here, unlike <u>Hilao</u>, state law is not implicated in any way -
as to service of the OSC or otherwise.  In the first place, this is
an action to execute on a money judgment pursuant to Fed. R. Civ.
P. 69.  As subsection (2) of that Rule allows,[8] Fidelity issued a
subpoena pursuant to Fed. R. Civ. P. 45(a)(2)(C) upon non-party
Elazar.  Elazar's failure to comply with that subpoena, in this
court's opinion, warranted an award of sanctions pursuant to Fed.
R. Civ. P. 45(e).  <u>See</u> <u>Fidelity</u>, 2007 WL 446134, at *4.  Fidelity
later brought a motion for an OSC seeking an order of contempt
pursuant to Fed. R. Civ. P. 37(b)(2)(D).  Fidelity also relied upon
this court's "inherent power to impose sanctions . . . for bad
faith conduct in litigation or for willful disobedience of a court
order[]" in accordance with federal case law.  OSC Mot. (Doc. 191)
at 12:14-16 (internal quotation marks and citation omitted).
Despite the absence of state law here, <u>Hilao</u> is nonetheless
instructive, especially as to Fed. R. Civ. P. 4.1.

There is no dispute that neither the Trust nor Mr. Hyman were
served with the OSC by a United States marshal or deputy marshal or
by a special appointee, as Rule 4.1(a) requires.  According to a
"Proof of Service" filed with this court, Fidelity purported to
serve the Trust and Mr. Hyman, among others, by sending them the
OSC via "overnight delivery[.]"  Def. Exh. 53 at 2-3 (emphasis

---

[8]      Rule 69(a)(2) provides in relevant part:

In aid of the judgment or execution, the judgment
creditor . . . may obtain discovery from any person
. . . as provided in these rules or by the procedure
of the state where the court is located.

Fed. R. Civ. P. 69(a)(2).

omitted).  Fidelity also purported to serve the Trust and Mr. Hyman
by overnight delivery the "civil minutes[,]" setting the hearing
date for the OSC and the completion date for the Elazar deposition.
See id.  Service by overnight delivery does not satisfy Rule
4.1(a)'s requirement that service be made by "United States marshal
or deputy marshal or by a person specially appointed for that
purpose."  Therefore, because Fidelity did not serve the OSC in
compliance with Rule 4.1 upon either the Trust or Mr. Hyman, this
court does not have personal jurisdiction over those two non-
parties.  See Liao v. Ashcroft, 2009 WL 636191, at *3 (N.D.Cal.
March 11, 2009) (citation omitted) ("Service of process (in the
absence of a voluntary appearance or a conscious waiver) is an
indispensable prerequisite to the court's jurisdiction to
proceed.")

       Because neither the Trust nor Mr. Hyman were properly served,
there is no need to address Fidelity's assertion that the Trust has
sufficient contacts with Arizona so as not to offend traditional
notions of due process.  Moreover, as will be seen, even if the
court could properly exercise personal jurisdiction over the Trust
and Mr. Hyman, Fidelity has not been its burden of proving contempt
by clear and convincing evidence as to either.

## II.  Civil Contempt

### A.  Background

       Fidelity contends that respondents should be found in contempt
for violating (1) the October, 2006 subpoena issued to non-party
Elazar; and (2)  this court's order to compel,  also directed

solely to Mr. Elazar.[9]  Ultimately roughly 400 documents were produced in response to those orders.  Tr. I (doc. 288) at 10; <u>see also</u> Pl. Exh. 11.  Yet, Fidelity is seeking a finding of contempt based upon the failure to timely produce a single document  – the "Deed of Full Release and Reconveyance (Beneficiary)" ("the Deed Release") (Pl. Exh. 15-1).

That Release, dated January 19, 2007, is signed by defendants Farid and Anita Meshkatai as "[m]anager[s]" of Eliani, LLC.  Pl. Exh. 15-1 <u>Id.</u>  The Meshkatais also signed that Release as "[b]eneficiar[ies]" under a "Deed of Trust executed by Yariv Elazar, Trustors(s) [sic], to Transnation Title Insurance Company Trustee, for the benefit of Eliani, . . . . , Beneficiary[.]" <u>Id.</u> Pursuant to the terms of that Release:

> Eliani, as 'the Beneficiary under [that] Deed of Trust[,] . . . release[d] and reconvey[ed], without covenant or warranty, express or implied, unto the parties legally entitled thereto all right, title and interest which was heretofore acquired by . . . Trustee [Transnation Title] under said Deed of Trust, for the benefit of the [Eliani].

<u>Id.</u>  Fidelity was not aware of this Deed Release until Mr. Elazar produced it at his May 14, 2008 deposition.  Mr. Elazar produced that Release at his May 14, 2008 deposition, in response to an April 8, 2008 subpoena *duces tecum* from Fidelity.

At his deposition, Mr. Elazar first became aware that the $1,170.00 in sanctions which this court ordered him to pay were paid by a March 12, 2007 check actually paid on a check drawn on the Eliani account, signed by Mrs. Meshkatai.  Pl. Exh. 12-1.

---

[9]      "A subpoena duces tecum is itself a court order[.]" <u>Fidelity</u>, 2007 WL 446134, at *4.  Thus, unless necessary to distinguish between the subpoena and the order to compel, hereinafter they shall be referred to collectively as "the orders."

Originally, in its OSC motion Fidelity was seeking a contempt order based upon this sanction payment, as well as upon the untimely production of the Deed Release. During the hearing there was proof, albeit scant, regarding the sanction payment. As Fidelity expounded upon its contempt theory, it did not mention the sanction payment at all. See, e.g. Tr. I (doc. 288) at 6-11; and Hearing Transcript (doc. 305) ("Tr. II") at 293-303. Evidently Fidelity has abandoned the theory that payment of the sanctions by Eliani constitutes contempt.

Narrowing the scope of relief which Fidelity is now seeking corresponds to the limitations which this court placed upon Fidelity in terms of available relief. As this court previously held, if that sanctions check was a violation of any order, it was the California RICO court's preliminary injunction freezing Eliani's assets, among others. See Fidelity I, 2009 WL 890471, at *3 and *4. Accordingly, as did Fidelity, the court will confine its inquiry to whether any of the respondents, due to the belated production of the Deed Release, can be held in contempt for violating this court's orders.

### B. Legal Standards - Generally

Fidelity argues that each of the respondents should be held in contempt for violating prior orders of this court. In considering this argument, the court will continue to be guided by the basic contempt principles set forth in Fidelity I.[10] The court stresses,

---

[10]    In Fidelity I, this court explained in relevant part:

> In a civil contempt proceeding, [t]he moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. . . . A mere[ ] . . . preponderance of the evidence[ ] will not

however, that because respondents were not subject to those prior

court orders, there must be a showing that they "either *abet[ted]*

[Elazar] [in violating those orders] *or* [are] *legally identified*

*with* [Elazar], . . . and that the[y] ha[d] notice of the

order[s][.]" <u>Fidelity I</u>, 2009 WL 890471, at *6 (quoting <u>Peterson v.</u>

<u>Highland Music, Inc.</u>, 140 F.3d 1313, 1323 (9th Cir. 1998) (citations

and internal quotation marks omitted) (emphasis added)).  Logically

then, Elazar's violation of this court's orders is a necessary

predicate to a finding of contempt against any of the five

respondents.  <u>See</u> <u>Red 1 Investments, Inc. v. Amphion International</u>

<u>Ltd.</u>, 2007 WL 3348594, at *2 (E.D. Wash. Nov. 9, 2007) ("[A] non-

party who is alleged to have acted in concert to aid and abet a

violation of an injunction can be held in contempt only upon the

'predicate' finding that the enjoined party has violated the

order.") (quoting <u>Levin v. Tiber Holding Corp.</u>, 277 F.3d 243 (2d

Cir. 2002) (citations omitted) (reversing district court's contempt

finding because an underlying violation of the consent decree was

not proven and hence there was no offense to aid and abet); <u>Alemite</u>

<u>Mfg. Corp. v. Staff</u>, 42 F.2d 832, 832-33 (2d Cir. 1930) (L.Hand,

J.) ("[N]o court can make a decree which will bind any one but a

party[.] . . .  Thus, the only occasion when a person not a party

may be punished [for contempt], is when he has helped to bring

about . . . what [the decree] has [the] power to forbid[.]") Thus,

although Fidelity is not seeking an order of contempt against

---

suffice. . . . Generally, a violation is shown by the party's
failure to take all reasonable steps within the party's
power to comply. . . . Willfulness is not an element of contempt.

<u>Fidelity I</u>, 2009 WL 890471, at *7 (citations and internal quotation marks omitted).

Elazar, it is necessary to consider whether the record supports a

finding that he violated either of the court's orders.

### *1. Yariv Elazar*

#### *a. Subpoena*

Mr. Elazar credibly testified that he received the first page

of the October, 2006 subpoena and another page with the caption of

this action on it, but not the accompanying "**DOCUMENT REQUESTS**"

page. Tr. I (doc. 288) at 54-57 (emphasis in original). Among the

documents requested on that page were "Any agreements,

transactions, or communications between [him] and *Eliani* LLC,

including but not limited to loans, promissory notes, security

agreements, and contracts." Pl. Exh. 1-3 (emphasis added). Because

Eliani is not a party to this action, and hence not named in the

caption, Mr. Elazar was unaware from the subpoena and the caption

that Fidelity was seeking information from him regarding his

relationship with Eliani. Tr. I (doc. 288) at 56-57. The

foregoing is uncontroverted. Therefore, because Mr. Elazar did not

have actual notice from the subpoena that he was to produce Eliani-

related documents, such as the Deed Release, he cannot be held in

contempt for failing to do so.

It is a closer call as to whether Elazar took all reasonable

steps in otherwise responding to the October, 2006 subpoena.

Elazar told the Meshkatais, as well as attorney Hyman, that he had

received the subpoena and provided documents to Fidelity. Id. at

96. Elazar faxed documents to what he believed to be Fidelity's

FAX number. Id. at 86-89. The record does not establish, however,

that Elazar took any actions to verify that Fidelity actually

received those faxed documents. Obviously, if Fidelity had

received them, it would not have filed a motion to compel against

Elazar.  Faxing documents to an unknown FAX number, as did Elazar,

id. at 114- 115, and never following up to verify receipt, does

not amount to taking all reasonable steps to comply with a

subpoena.  Based upon the foregoing, except for the Deed Release,

the record supports a finding - consistent with the order to compel

-- that given the manner in which Elazar responded to the 2006

subpoena, he engaged in contemptuous conduct.

### b.  *Order to Compel*

Conversely, the record does not support a finding of

contemptuous conduct by Elazar as to the order to compel.  The

court issued that order on February 7, 2007, but Elazar did not

receive a copy of it then.  Id. at 67.  Elazar was thus unaware

that the court had ordered him to produce documents responsive to

the subpoena, and that he had been ordered to pay sanctions.  Id.

at 60 and 67.  In keeping with his testimony that he never hired

attorney Hyman to represent him in this matter, Elazar further

testified that he was unaware that on February 21, 2007, Hyman

provided to Fidelity, purportedly on Elazar's behalf, roughly 400

pages of documents.  Id. at 70-73.

Eventually, in response to an April 8, 2008 subpoena *duces*

*tecum* issued to Mr. Elazar at Fidelity's behest, at his May 8, 2008

deposition Elazar produced the lone document which is the subject

of this proceeding - the Deed Release.  Id. 77-79.  Although Eliani

is not among the 35 "persons" identified in the attached document

request, the requested documents also pertain to "any affiliated

entity" of those persons, such as Eliani.  Pl. Exh. 17-3 - 17-6.

The record as presently constituted establishes that Elazar did not

have notice that he was to produce any Eliani-related documents until he received that subpoena *duces tecum*. Accordingly, Fidelity has not met its burden of showing that Elazar violated the order to compel.

To summarize, the record supports a predicate finding of contempt by Elazar as to the subpoena, although not in terms of the Deed Release. On this record Fidelity has not shown, however, that Elazar engaged in contemptuous conduct with respect to the order to compel. Nonetheless, the court will assume such a finding for the sake of analysis.

### C. *Legal Standards - Respondents*

In light of the preceding analysis, the next issue is whether any of the respondents abetted Elazar in violating either or both of the court's orders, or whether they are "legally identified" with him, such that his contemptuous conduct can be imputed to them. There is a paucity of case law as to what constitutes abetting for purposes of finding a non-party in civil contempt. The court will therefore borrow Black's Law Dictionary definition of abet, recognizing that that definition is in the criminal context. That Dictionary defines abet as "aid[ing], encourag[ing], or assist[ing] (someone), . . . in the commission of" an act, or support[ing] . . . by active assistance[.]" Black's Law Dictionary (8th ed. 2004).

In contrast to abetting a contemnor, there is case law, albeit scant, as to what it means for a non-party to be "legally identified" with a contemnor. It is well settled that "[a]n order to a corporation or other entity binds those who are legally responsible for the conduct of its affairs." U.S. v. Laurins, 857

F.2d 529, 535 (9th Cir. 1988) (citations omitted)  Relying upon that

principle, in <u>United States v. Montgomery Global Advisors V LLC</u>,

2006 WL 950101 (N.D.Cal. Mar. 2, 2006), although the contempt order

was directed solely to a corporate defendant, the court found that

the managing member could be held personally liable for that

defendant's contempt.  <u>Id.</u> at *2.  The court reasoned that "as the

managing member of [the corporate defendant], clearly [that member]

had and continues to have the ability to act on behalf of that

entity and is therefore legally identified with it."  <u>Id.</u>; <u>see also</u>

<u>NLRB v. Sequoia Dist. Council of Carpenters</u>, 568 F.2d 628, 633 (9th

Cir. 1977) ("It can hardly be argued that the principal officers of

a labor union are not legally identified with it, and thus liable

in contempt for disobeying an order directed to the union.")

     <u>1st Technology, LLC v. Rational Enterprises LTDA</u>, 2008 WL

4571057, at *8 (D.Nev. July 29, 2008), <u>adopted</u> <u>and</u> <u>affirmed</u>, 2008

WL 4974580 (D.Nev. Nov. 21, 2008), is particularly instructive in

that it addresses the burden of proof issue.  The plaintiff there

sought an OSC why a non-party, Bodog IP Holdings, "should not be

held in contempt for [defendant] Bodog.com's failure or refusal to

comply with the Court's discovery order."  <u>Id.</u> at *8.  The court

found that "if Defendant Bodog.com was and is a 'd/b/a' of Bodog IP

Holdings, which is legally responsible for its compliance with the

discovery order, then Bodog IP Holdings is potentially subject to

contempt for Bodog.com's failure or refusal to comply with the

Court's order."  <u>Id.</u>  Significantly, the court held that "[t]he

burden is upon Plaintiff to show that Bodog.com is a d/b/a of Bodog

IP Holdings."  <u>Id.</u>  Due to "insufficient evidence or information"

to establish that d/b/a relationship, the <u>1st Technology</u> court

declined to issue an order to Bodog IP Holdings to show cause why it should not be held in contempt.  <u>Id.</u>  That ruling was without prejudice "to Plaintiff demonstrating facts or evidence which would support an issuance of an [OSC] to Bodog IP Holdings."  <u>Id.</u>  Of course, in the present case, Fidelity has had more than ample opportunity to obtain and marshal the evidence to establish legal identity.

### *1.  The Trust*

As previously discussed, this court lacks personal jurisdiction over the Trust because it was not properly served with the OSC in accordance with Fed. R. Civ. P. 4.1.  Even assuming *arguendo* that this court has personal jurisdiction over the Trust, Fidelity has not met its burden of showing that the Trust should be held in contempt for violating this court's orders.

In the first place, Fidelity has not met its burden of showing that the Trust abetted Elazar in violating those orders.  Fidelity has not shown that the Trust had any involvement in Elazar's production of the subpoenaed documents.  Mr. Elazar testified several times that he acted alone in producing the subpoenaed documents. Further, as already noted, Mr. Elazar believed that he was to provide documents pertaining to only the parties named in the caption of this action.  The Trust is not one of those parties.  Therefore, it would have made no sense for the Trust to have been aiding or assisting Elazar in responding to that subpoena. The absence of record proof connecting the Trust to Elazar's October 2006 document production, precludes a finding that the Trust abetted Elazar in that production.  There is a similar lack of proof in terms of the Trust abetting Elazar in violating this

1   court's order to compel.  The court thus finds that Fidelity has

2   not met its burden of showing that the Trust abetted Elazar in

3   violating either of this court's prior orders.

4       Interestingly, despite arguing that "[t]he Trust is legally

5   identified with Eliani and Farid and Anita Meshkatai[,]" Fidelity

6   did not explicitly argue that the Trust was legally identified with

7   Elazar. Reply (doc. 222) at 7:2-3.  However, because the court has

8   just found that the Trust cannot be held liable for abetting

9   contempt, it will briefly consider whether the Trust could be held

10  liable on the theory that it is legally identified with Elazar.  As

11  with abetting, Fidelity also has not met this burden of proof.

12      Fidelity makes much of the fact that the Trust was the funding

13  mechanism for Eliani.  Mr. Elazar, in turn, had a joint venture

14  with Eliani for real estate development of three properties.  Tr. I

15  (doc. 288) at 40; 42-44; see also Pl. Exh. 11-257-259.  That

16  funding does not establish that the Trust is legally identified

17  with Elazar absent a showing by Fidelity that the Trust was

18  "legally responsible" for Mr. Elazar's individual or personal

19  "affairs."  See Laurins, 857 F.2d at 553.  Likewise, Fidelity has

20  not shown that the Trust "had and continues to have the ability to

21  act on behalf of" Elazar individually or personally.  See

22  Montgomery Global, 2006 WL 950101, at *2.  Hence, regardless of

23  whether the focus is upon the subpoena or the order to compel,

24  Fidelity has not met its burden of showing that the Trust is

25  legally identified with Elazar such that the Trust should be held

26  in contempt for Elazar's violations, if any, of this court's prior

27  orders.

28  . . .

### *2. Anita Meshkatai*

For the same reasons discussed above as to the Trust, the court finds that Fidelity also has not met its burden of showing that Mrs. Meshkatai was legally identified with Mr. Elazar. Nor has Fidelity met its burden of showing that Mrs. Meshkatai abetted Elazar in violating this court's orders. There is no proof that in October 2006 Mrs. Meshkatai assisted Mr. Elazar in any way in responding to the subpoena. Again, Mr. Elazar acted alone when he faxed the documents to what he believed to be Fidelity. Given that lack of proof, clearly the record does not support a finding that Mrs. Meshkatai "aided, encouraged, assisted, or supported by active assistance," Mr. Elazar in responding to that subpoena. <u>See</u> Black's Law Dictionary (8th ed. 2004).

Although Mrs. Meshkatai received the order to compel, she never instructed Mr. Elazar to take any action with respect thereto. Tr. II (doc. 305) at 99. Moreover, according to Mrs. Meshkatai, Elazar never asked her about the order. <u>Id.</u> at 99-100. Mrs. Meshkatai did recall a "casual conversation" with Mr. Elazar in February, 2007, shortly after the issuance of the order to compel. <u>Id.</u> at 120. The purpose of that conversation was not to get Elazar's assistance in producing documents to comply with that order, however. <u>Id.</u> Consequently, even if the court were to find Elazar in contempt with respect to the order to compel, Fidelity has not met its burden of showing that Mrs. Meshkatai abetted that contempt.

### *3. Attorney Campbell*

As with the other respondents, the court's focus is upon whether attorney Campbell was "legally identified" with Elazar or

- 25 -

whether he abetted Elazar in violating the subpoena or the order to compel.

### a. *Subpoena*

In October 2006, when Elazar responded to the subpoena by faxing documents to what he believed to be Fidelity, he had no connection with attorney Campbell. Prior to that time, Campbell did notify Fidelity that he was representing the Meshkatais; but there is no mention of Elazar. Def. Exh. 34 at 1. It is easy to see why Elazar is not mentioned in that letter. As Mr. Campbell explained his role to Fidelity then, he was "assuming the representation" of the Meshkatais from another attorney in connection with judgment debtors' examinations. Id. In any event, although Elazar was completely unaware of it, attorney Campbell did not file a Notice of Appearance on Elazar's behalf until December 4, 2006 – a couple of months after Elazar responded to the subpoena. See Tr. I (doc. 288) at 64; and Pl. Exh. 7. Consequently, Fidelity has not shown, as it must, that attorney Campbell was legally identified with Elazar when Elazar responded to the subpoena in early October 2006. The only way then in which Mr. Campbell could be found in contempt as to the subpoena is if he abetted Mr. Elazar in violating it. Given Mr. Elazar's repeated and uncontroverted disavowal of any association with Mr. Campbell during the relevant time frame, plainly Campbell did nothing to abet Elazar's actions.

Further, even if Campbell became legally identified with Elazar through the filing of December 4, 2006, Notice of

Appearance,[11] Campbell cannot be held in contempt based upon Elazar's actions prior to that date, *i.e.*, Elazar's faxing of documents in October 2006 to an entity he believed to be Fidelity, and failing to verify receipt.

Moreover, Campbell's actions after the filing of the Notice of Appearance do not constitute abetting Mr. Elazar in violating the subpoena. On behalf of Mr. Elazar and the Meshkatais, attorney Campbell did file a response to Fidelity's motion to compel compliance with the October, 2006 subpoena. See Pl. Exh. 8. Once a party such as Fidelity files a motion, LR Civ 7.2(c) expressly allows for the filing of a responsive memorandum. There simply is no basis for finding that the filing of a response to a motion to compel, in accordance with the Local Rules, constitutes abetting a violation of a subpoena. Thus, attorney Campbell cannot be found in contempt for abetting a violation of the subpoena, even if he became legally identified with Elazar in December 2006.

### *b. Order to Compel*

Next the court must consider whether Fidelity has shown that Mr. Campbell was legally identified with Elazar for purposes of the order to compel, or, assuming a violation of that order by Elazar, whether Campbell abetted him in that violation. Fidelity has shown neither. Again, not until his May 2008 deposition did Mr. Elazar become aware of attorney Campbell's purported representation of Elazar. Therefore, the court is hard pressed to find that for

---

[11] Seemingly the filing of a notice of appearance would mean that that attorney and that client are "legally identified." Mr. Elazar emphatically testified that he never hired or authorized attorney Campbell to respond or object to the subpoena, however. See, e.g., Tr. I (doc. 288) at 56-57; and 63. Under these circumstances, Campbell's filing of a notice of appearance does not result in a finding that he was legally identified with Elazar at that time.

contempt purposes Campbell was legally identified with Elazar in terms of the order to compel. Likewise, because cumulatively the evidence shows that attorney Campbell did not have any contact with Mr. Elazar regarding the order to compel, he could not have abetted Elazar in any violation thereof. Not only that, but the evidence outlined below easily supports the reasonable inference that Mr. Meshkatai and attorney Hyman were orchestrating the document production in response to the order to compel.

After learning of the order to compel, attorney Campbell advised Mr. Meshkatai and attorney Hyman. Tr. II (doc. 305) at 266. In the approximately two weeks between issuance of the order to compel and production of the documents by attorney Hyman, Mr. Campbell testified that he and Ms. Hemann, an associate in his office, had several communications with Mr. Meshkatai. Id. at 265-272. During that time, Mr. Meshkatai informed Campbell that, through attorney Hyman, Mr. Meshkatai would be producing the documents responsive to the order. Id. at 268. Other record evidence, discussed below, demonstrates that the documents were produced in accordance with Mr. Meshkatai's direction. There is simply no credible proof that attorney Campbell abetted Elazar in violating the order to compel.

### 4.  *Farid Meshkatai and Allen Hyman*[12]

As the record demonstrates, Mr. Meshkatai and Mr. Hyman had integral and closely intertwined roles in responding to the Elazar subpoena and the resultant order to compel. Therefore, the court

---

[12]     For the sake of argument, the court assumes that it may properly exercise personal jurisdiction over Mr. Hyman, despite the lack of proper service, as discussed earlier. Also for the sake of argument, the court continues to assume that Mr. Elazar violated the order to compel.

will jointly address the evidence as to them.

### a.  *"Legally Identified"*

Undisputably, Messrs. Elazar and Meshkatai have a close business relationship.  Mr. Meshkatai is a manager of Eliani - a joint venture to which Mr. Elazar is a party.  Tr. I (doc. 288) at 40; 42-44; see also Pl. Exh. 11-257-259.  Nevertheless, that business relationship does not translate to a finding that Mr. Meshkatai is legally identified with Mr. Elazar for contempt purposes.  There has been no showing by Fidelity, who has the burden of proof on this issue, see 1st Technology, 2008 WL 4571057, at *8, that Mr. Meshkatai is legally responsible for the affairs of Mr. Elazar individually.  Fidelity also has not demonstrated that Mr. Meshkatai "had and continues to have the ability to act on behalf" of Mr. Elazar so as to be legally identified with Elazar. See Montgomery Global, 2006 WL 9501, at *2.  The result may well have been different if Fidelity had served Mr. Elazar with a subpoena directed to Eliani, but it did not.  There is no basis on the record as presently constituted  for finding that Mr. Meshkatai is "legally identified" with Mr. Elazar with respect to this court's orders.  Thus, Mr. Meshkatai cannot be found in contempt on that basis.

Although for a different reason, attorney Hyman also cannot be found in contempt for being "legally identified" with Mr. Elazar. As with attorney Campbell, based upon Mr. Elazar's credible testimony that he never authorized attorney Hyman to represent him or in any way act on his behalf, there is no basis for finding that Hyman is "legally identified" with Mr. Elazar.  Consequently, Mr. Hyman cannot be found in contempt on that basis.

### b. Abetting

The evidence paints a troubling picture, though, as to Mr. Meshkatai's and attorney Hyman's conduct surrounding the subpoena and the order to compel.  Basically, without Mr. Elazar's knowledge or consent, attorney Hyman and Mr. Meshkatai took it upon themselves to orchestrate how to respond to the Elazar subpoena. Also wholly without Elazar's knowledge or consent, attorney Hyman and Mr. Meshkatai  produced the documents in response to the order to compel.  They failed to produce the Deed Release which is at the center of this contempt proceeding, however.

### I.  Subpoena

Since 2006, attorney Hyman had been defending the Meshkatais in two parallel California federal court actions also commenced by Fidelity.  Tr. I (doc. 288) at 243-44.  As part of that defense, attorney Hyman managed the receipt and production of countless documents.  Id. at 215-16.  By February 2007, Hyman estimates that he had produced between 5,000 - 10,000 pages of Meshkatai documents and had received 16 banker's boxes of documents from Fidelity.  Id. at 232-233.  Attorney Hyman's office was, as Mr. Meshkatai described it, the "center of [document] production" for all Fidelity-related document requests, and Hyman "was in charge of all the subpoenas[.]" Id. at 245; and 258; see also Tr. II (doc. 305) at 108.  Attorney Hyman unconvincingly attempted to diminish his role in the document production in the two parallel California actions.  Testimony pertaining to the scope of Fidelity's requests and the volumes of documents provided to Hyman significantly undermines Hyman's testimony on this point.

Given attorney Hyman's heavy involvement in the California

document requests, the court finds credible the testimony that after Elazar told Mr. Meshkatai about the subpoena in this action, Mr. Meshkatai asked Elazar for the subpoena and then immediately contacted Hyman.  See id. at 85; 107; 245; and 267-68.  In turn, attorney Hyman requested that Mr. Meshkatai fax the subpoena to him so Hyman could discuss it with Elazar.  Id. at 267-269.  During their phone conversation, Elazar told Hyman that he had already faxed documents to Fidelity; and he identified those documents. Id. at 87.

Knowing that Elazar had already produced documents responsive to the subpoena, on October 19, 2006, unbeknownst to Mr. Elazar, Mr. Hyman wrote Fidelity informing it that his "office represents Variv [sic] Elazar[,]" and outlining Hyman's objections to the subpoena.  Pl. Exh. at 2-1-2.  In a November 7, 2006, letter to Fidelity also pertaining to the subpoena, Hyman reiterated that he "represent[s] Variv [sic] Elazar[.]" Pl. Exh. 3-1.  Although Mr. Meshkatai denied "hir[ing] [Mr.] Hyman to do any work for [Mr.] Elazar[,]" it strains credulity to believe that Mr. Hyman would have written those letters on his own volition.  See Tr. I (doc. 288) at 244-45.  The evidence as whole supports the reasonable inference that Mr. Hyman wrote those letters at Mr. Meshkatai's behest.

Moreover, there is no reason to believe that Mr. Elazar hired Hyman or otherwise authorized him to act on his behalf with respect to the subpoena.  Not only did Elazar credibly deny having hired Hyman, it would have been illogical for him to have done so when he did not object to producing, and in fact did produce, the documents in his possession responsive to the subpoena.  Id. at 57.  The only

reasonable inference on this record is that at Mr. Meshkatai's

behest attorney Hyman undertook Mr. Elazar's representation as to

the subpoena. Bolstering this conclusion is the business

relationship between Mr. Elazar and Mr. Meshkatai. It is not as

though Mr. Meshkatai was requesting that attorney Hyman represent

the interests of a complete stranger. According to attorney Hyman,

Mr. Meshkatai gave him a check, drawn on an Eliani account, to pay

the sanctions for Mr. Elazar because Elazar was a "good friend" and

Mr. Meshkatai believed he was somewhat responsible for the order to

compel. Id. at 180.

Partly because of Mr. Hyman's evasiveness, it is less clear

whether he or Mr. Meshkatai, or perhaps both, sought to have

attorney Campbell represent Mr. Elazar in responding to the motion

to compel. See id. What is clear is that as with attorney Hyman,

at no time did Mr. Elazar hire attorney Campbell or otherwise

authorize Campbell to act on his behalf. In fact, Elazar testified

that Mr. Meshkatai never informed him that Fidelity had filed a

motion to compel with respect to the Elazar subpoena. Id. at 131.

Instead, at Mr. Meshkatai's request, attorney Hyman provided

Campbell with materials to prepare a response to the motion to

compel. See Hyman exh. 36; see also Tr. I (doc. 288) at 166; 168

and 212. Consequently, attorney Campbell's response to Fidelity's

motion substantially mirrors attorney Hyman's initial objections to

Fidelity.

The court does not condone the involvement of Messrs. Hyman

and Meshkatai in the Elazar subpoena. Their conduct comes

perilously close to abetting contempt as to that subpoena. Perhaps

the most significant reason why Mr. Meshkatai's conduct borders on

- 32 -

abetting is that, unbeknownst to Mr. Elazar, he facilitated
attorney Hyman's representation of Elazar.  That representation, in
turn, set off a chain of events ultimately resulting in the order
to compel and sanctions against Mr. Elazar.  Attorney Hyman was
complicit in Mr. Meshkatai's action, although perhaps unwittingly.
At the end of the day, however, the court is forced to conclude
that Fidelity has not met its burden of proving by clear and
convincing evidence that either Mr. Hyman or Mr. Meshkatai abetted
Elazar in violating the subpoena.

### ii.  *Order to Compel*

In granting Fidelity's motion to compel on February 7, 2008,
this court ordered Mr. Elazar to produce documents responsive to
the subpoena, and to pay Fidelity $1,170.00 in sanctions.  Pl. Exh.
9-9.  Many documents were produced in accordance with that order,
but not by Mr. Elazar.  The sanctions were also paid, but not by
Mr. Elazar.  Instead, again without Mr. Elazar's knowledge or
consent, attorney Hyman and Mr. Meshkatai produced those documents
and paid the sanctions.  They did so without informing Elazar, who
did not become aware of that order until well after its issuance.
See, e.g., Tr. I (doc. 288) at 67-68; 132; and 141.  Likewise, at
his May 2008 deposition, Mr. Elazar first learned that the
sanctions against him had been paid by Eliani.  Id. at 73-74.

Rather than consulting with Mr. Elazar about the order to
compel, on February 21, 2007, attorney Hyman directly provided
Fidelity with roughly 400 pages of documents.  Pl. exh. 11.  Mr.
Hyman advised Fidelity that he was "provid[ing]" those "documents
. . . in response to the subpoena of documents to Yariv Elazar."
Id. at 11-1.  Hyman further requested that Fidelity review those

- 33 -

documents and that "if any concerns remain," Fidelity should "contact this [Hyman's] office." Id. Critically, this letter was sent without Mr. Elazar's authorization, and Elazar did not provide those documents. Tr. I (doc. 288) at 71; and 72. What more, after receiving the documents, attorney Hyman candidly admitted that he did not review them. Id. at 228. In his words, Hyman simply "[b]ate[s] stamped the[] [documents] and sent them on[]" to Fidelity. Id.

Attorney Hyman did equivocate in terms of who was the source of those documents – Mr. Meshkatai, Mr. Elazar and/or attorney Campbell. See id. at 173; 202; and 227. Based upon the record as a whole and the demeanor of the witnesses, although Mr. Meshkatai flatly denies it, id. at 250, the court finds that he was the source of those documents. Mr. Meshkatai's denial is incredulous for several reasons. First, given his active role in all aspects of document production in this and the two California actions, see, e.g., id. at 246; and at 252-53, the court is hard pressed to believe that Mr. Meshkatai suddenly decided to relinquish all control to Mr. Hyman. It makes no sense that Mr. Meshkatai, who had been involved with the Elazar subpoena almost from the outset, would take a back seat and wholly defer to attorney Hyman.

Another reason for disbelieving Mr. Meshkatai when he denies providing documents to attorney Hyman is that at that time, in February 2007, Mr. Meshkatai explained that he was providing documents to Hyman in both California actions. Id. at 252-253. Given the sheer volume of documents which Mr. Meshkatai was turning over to attorney Hyman then, and his ongoing involvement in discovery in those parallel actions, it is easy to see how Mr.

Meshkatai might be confused as to exactly what documents he
provided to attorney Hyman with respect to the Elazar subpoena.

Viewing the record as a whole, however, the court finds that
even assuming (1) contempt by Elazar, and (2) personal jurisdiction
over Hyman, Fidelity has not met its stringent burden of showing
that attorney Hyman or Mr. Meshkatai abetted a violation of the
order to compel. Both treaded dangerously close to abetting
contempt of that order, but Fidelity was unable to show that Mr.
Meshkatai or attorney Hyman crossed that fine line. At best,
Fidelity's proof may have satisfied the preponderance of the
evidence standard, but that is not enough. See Fidelity I, 2009 WL
890471, at *7 (citations omitted). Fidelity must satisfy the
higher, clear and convincing evidence standard; it has not done
that. See id. at *7 (citations omitted).

Mr. Meshkatai has taken a no-holds-barred approach in
attempting to thwart Fidelity's collection efforts, including
engaging in contemptuous conduct in the related California actions.
Indeed, neither he nor attorney Hyman are strangers to contempt
proceedings. See, e.g., Pl. Exh. 57 (Mr. Meshkatai found in civil
contempt for failing to produce document and ordering payment to
Fidelity of $8,175.00 in sanctions); and Pl. Exh. 58 (footnote
omitted) (finding Messrs. Meshkatai and Hyman "jointly and
severally liable for . . . contempt sanctions" and awarding
Fidelity "$39,717.50 in sanctions[]"); and RJN (doc. 268), exh. 18
thereto at 140 (listing contempt findings as to Mr. Meshkatai); and
RJN (doc. 268), exh. 15 thereto (RICO court finding Mr. Meshkatai,
among others, in contempt for violating an asset freeze preliminary
injunction order). Consequently, it is understandable that in this

1  action Fidelity would view the conduct of Messrs. Hyman and
2  Meshkatai through that prism.  Skepticism and innuendo are no
3  substitute for clear and convincing proof of abetting contempt.  As
4  earlier noted, it was incumbent upon Fidelity in the first instance
5  to make out a *prima facie* showing of contempt.  Fidelity did not do
6  that.

7      To summarize, at nearly every step of the way there are
8  deficiencies in Fidelity's proof.  First, it did not establish that
9  this court has personal jurisdiction over the Trust or attorney
10 Hyman.  Second, it did not show that Mr. Elazar should be held in
11 contempt for violating this court's orders  - a necessary predicate
12 to a finding of contempt by any of the five respondents.  Third,
13 Fidelity has not shown that any of the respondents were legally
14 identified with Mr. Elazar, or that they abetted him, such that any
15 contempt by him should be imputed to respondents.  In light of the
16 foregoing, there is no legal or factual basis for finding that any
17 of the five respondents should be held in contempt for violating
18 the October 2006 subpoena or the subsequent order to compel.

19 *IV.  Remedy*

20      Having found that none of the respondents can be held in
21 contempt, the issue of remedies is moot.

22                          *Conclusion*

23      For the reasons set forth above, the court hereby ORDERS that:

24      (1) the Request for "Motion for Discharge of the O.S.C." by
25 Allen Hyman (doc. 264) is GRANTED;

26      (2) Request to Take Judicial Notice by Allen Hyman is GRANTED
27 (doc. 268); and

28      (3) Fidelity's Order to Show Cause seeking to hold in contempt

defendants, The Anna and Noach Kramer Irrevocable Insurance Trust;

Anita Meshkatai, individually and as trustee of the Anita Kramer

Living Trust, dated July 23, 1987; and Farid Meshkatai; and non-

parties, Daniel Campbell and Allen Hyman is in all respects DENIED.

DATED this 12th day of March, 2010.

_____

Robert C. Broomfield

Senior United States District Judge

Copies to counsel of record; attorneys Daniel Campbell; Allen Hyman

and Denise O'Rourke